UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                          :

OTIS A. DANIEL,
                            Plaintiff,    :          13 Civ. 4384 (PAE)
                                            :

                    -v-                    :          <u>OPINION & ORDER</u>
                                            :

T&M PROTECTION RESOURCES, INC.,      :
EDWARD J. MINSKOFF EQUITIES,        :
                                          :
                       Defendants.    :
                                          :
------------------------------------------------------------------------X


PAUL A. ENGELMAYER, District Judge:

       Otis Daniel, a former Fire Safety Director at 590 Madison Avenue, New York, NY ("590

Madison"), brings this lawsuit *pro se* against the company that directly employed him there,

T&M Protection Resources ("T&M"), and the property manager of the building, Edward J.

Minskoff Equities ("Minskoff"), alleging that they harassed and fired him because of his race,

national origin, and sexual orientation, violated the Family and Medical Leave Act ("FMLA"),

29 U.S.C. §§ 2601 *et seq*, and committed common law negligence by subjecting him to the

discriminatory conduct of their agent, the building's security director, John Melidones.  Minskoff

now moves to dismiss on the grounds that:  (1) the Title VII claim against it is not cognizable

because Daniel's charge from the New York State Department of Human Rights did not mention

Minskoff; (2) the Complaint in any event does not state a claim for employment discrimination

or under the FMLA because it fails  and also because Minskoff was not his employer; and (3) the

Complaint does not state a claim for common law negligence.  Minskoff also argues that if the

federal claims against it are dismissed, this Court should decline to exercise supplemental

jurisdiction over Daniel's claims brought under state law.  For the reasons that follow, the

motion to dismiss is denied as to the Title VII, FMLA, NYSHRL, and NYCRL claims against it, and granted as to the negligence claim.

## I.    Background[1]

### A.    The Parties

Minskoff is the property manager and a co-owner of 590 Madison, also known as the IBM Building, a 42-story commercial office building in midtown Manhattan.  SAC ¶¶ 2–4. T&M has a contract with Minskoff to provide security services at 590 Madison.  *Id.* ¶¶ 9, 14, 17. Daniel worked as a Fire Safety / Emergency Action Plan (EAP) director at 590 Madison between February 1, 2011 and May 18, 2012.  *Id.* ¶¶ 35, 52.  Daniel avers that he was an exceptional employee who did his work with little to no need for supervision.  SAC Claim 1 ¶ 7.

### B.    Daniel's Employment at 590 Madison

On December 28, 2010, Daniel was interviewed and hired by a security personnel recruiter at T&M, Tom Dolan.  SAC ¶ 32.  In December 2010 and January 2011, Dolan sent Daniel to interview for Fire Safety and/or EAP positions with a number of T&M clients.  *Id.* ¶ 33.  In late January, Dolan sent Daniel to 590 Madison to be interviewed by William Woods, Minskoff's assistant property manager, and John Melidones, the building's security director.  *Id.* ¶ 34.

On February 1, 2011, Daniel started work at 590 Madison as a Fire Safety / EAP director. *Id.*  ¶¶ 35–36.  Melidones delegated supervisory duties to Daniel and another fire safety / EAP

---

[1] For the purpose of resolving the motion to dismiss, the Court assumes all facts pled in the Second Amended Complaint ("SAC"), Dkt. 31, to be true, drawing all reasonable inferences in favor of the plaintiff.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

Separately, the Court notes that each section of the Complaint numbers its paragraphs anew. Thus, the section labeled "Statement of Claims" has paragraphs numbered 1–57, the section labeled "Claim 1: Termination of My Employment" has paragraphs numbered 1–41, etc.  When referring to paragraphs of the Complaint other than the initial Statement of Claims section, the Court notes in which section the paragraphs are contained.

director.  *Id.* ¶ 35.  Daniel's duties were to:  (1) monitor and respond to the fire command station

in the rear lobby of 590 Madison; (2) make announcements over the public address system

regarding potential fire emergencies, including their affected areas and routes of escape; (3) act

as a liaison between first responders and tenants; (4) assist with or conduct fire drills; and (5)

inspect equipment such as fire extinguishers and alarms.  *Id.* ¶ 36.  Daniel was stationed at a

work podium in the rear lobby.

Melidones told Daniel that he would receive a pay raise if he passed an on-site test

mandated by the Fire Department, City of New York (FDNY).  *Id.* ¶ 35.  On August 11, 2011, an

FDNY Inspector came to 590 Madison and administered to Daniel an oral, written, and visual

on-site fire safety director examination.  *Id.* ¶ 37.  In September 2011, Daniel learned he had

passed the exam.  *Id.*  The FDNY then issued him a license bearing his photograph, certifying

him as a fire safety director at 590 Madison.  *Id.*

On December 1, 2011, Joseph Greisch, Minskoff's building manager, wrote to the FDNY

to schedule a second examination for Daniel, this time as an EAP director.  *Id.* ¶ 38; *id.* Ex. A, p.

5.  The fire safety director license is a prerequisite for the EAP director license.  *Id.* ¶ 38.

Greisch's letter referred to Daniel as "an employee of T&M Protection in good standing."  *Id.*

Ex. A, p. 5.  Daniel appears to have obtained his EAP license.  *Id.* ¶ 38; *id.* Ex. A, p. 6.

### C.   The Alleged Denial of Leave for Family and Medical Reasons

The SAC alleges that, during the course of Daniel's employment, Melidones frequently

denied Daniel's requests for leave to enable him to deal with his own illnesses or his father's

diabetes and renal failure and ensuing hospitalizations.  SAC Claim 7 ¶ 1.  The SAC states that

Greisch, after seeing or hearing how sick Daniel was, instructed Melidones to grant Daniel days

off on numerous occasions.  *Id.* ¶ 2.  The SAC alleges that the denials and delayed approvals of

Daniel's leave requests by Melidones "and or" Griesch caused his medical condition to worsen and caused him extreme emotional and mental anguish as a result of worrying about his father's health condition.  *Id.* ¶ 3.

On February 7, 2011, during Daniel's second week on the job, he found himself in excruciating pain, unable to walk or stand for long periods.  *Id.*  Melidones and Greisch saw that Daniel was in pain.  *Id.* ¶ 2.  After work, Daniel went to the emergency room at St. Luke's-Roosevelt Hospital, where he was told that an abscess in his thigh was causing an infection to spread throughout his body and affect his kidneys.  *Id.*  He was placed on antibiotics and kept in the hospital for three days.  *Id.*  During that time, Melidones threatened, by both phone and text message, to fire Daniel if his illness had been fabricated, and demanded a doctor's note before Daniel could return to work.  *Id.*  Although the doctor told Daniel that he would be ready to return to work on Monday, February 14, 2011, Daniel appears to have returned to work earlier, on Thursday, February 10, 2011, because he felt that he otherwise risked losing his job.  *Id.*  Some time in February 2011, perhaps during his hospitalization, Melidones told Daniel, contrary to company policy, that if Daniel needed to take off work, he would need to find his own replacement.  *Id.* ¶¶ 4–5.  In August 2011, Melidones repeated this directive to Daniel.  *Id.* ¶ 4.  This forced Daniel to rely on a single replacement, who was available only on certain days of the week.  *Id.* ¶ 5.

Between June 2011 and December 2011, there was a foul odor in the lobbies of 590 Madison.  *Id.* ¶ 2.  The odor emanated from the ceiling vents, below which Daniel and other security personnel directly stood.  *Id.*  In December 2011, building engineers discovered that the odor was caused by a badly corroded and ruptured sewer pipe.  *Id.*  Daniel alleges that the odor caused him to be sick.  *Id.*

In December 2011, Daniel was suffering from excruciating pain in his teeth and gums. SAC Claim 8 ¶ 16.  Because he was unable to take off work, he had to see a dentist "on an emergency basis."  *Id.*

### D.    The Alleged Harassment Based on Sexual Orientation

Daniel, a gay man of African descent from St. Vincent and the Grenadines, in the West Indies, alleges that Melidones repeatedly harassed him on the basis of his race, sexual orientation, and nationality.  SAC ¶ 39.  Daniel also alleges that Melidones harassed other workers and that all such workers who attempted to complain to T&M or Minskoff management about the harassment were fired.  *Id.*

Daniel alleges that almost every day between June and September 2011, Melidones watched Daniel change his clothes or nap in the male locker room.  SAC Claim 3 ¶ 2.  One day in July 2011, at around 2 p.m., Melidones came to Daniel's work podium, brushed his genitals against Daniel's buttocks, and asked Daniel if he was gay.  *Id.* ¶¶ 3–4.  When Daniel did not respond, Melidones told him that his son was gay.  *Id.* ¶ 3.

Between July 2011 and September 2011, almost every day after Daniel returned from work, Melidones came up behind him at his podium and said, apparently in reference to nearby co-worker Manual Perdomo, "Manny the Homo, Manny the Homo, Homo."  *Id.* ¶ 5.  In September 2011, Daniel changed work shifts to the 4 p.m. to midnight shift, primarily to avoid working with Melidones.  *Id.* ¶ 7.

Between September 2011 and May 2012, Melidones repeatedly told Daniel "be a man, man up."  SAC Claim 5 ¶ 1.  Daniel believes that Melidones said this to him in reference to his sexual orientation.  *Id.*  These comments made Daniel "feel emasculated, not masculine or manly enough."  *Id.*

In March 2012, Melidones called Daniel at his workstation to inform Daniel that he, Melidones, was at a Broadway show, Mary Poppins, and remarked "I can see you as Mary Poppins, you'll make a good Mary Poppins."  *Id.* ¶ 6.

Daniel alleges that T&M and Minskoff management knew about this harassment but did nothing.  *Id.* ¶ 8; SAC Claim 3 ¶ 14.

### E.     The Alleged Harassment Based on National Origin

During Daniel's employment, Melidones frequently spoke to him in an imitated English accent, told him he was not black, asked him about British affairs, and told him to go back to his country of England.  SAC Claim 6 ¶¶ 1–3.  Daniel believed that Melidones relentlessly questioned him about British affairs because Daniel speaks with an accent and Melidones believed he was English.  *Id.* ¶ 2.  Greisch and Lisa Migliore, Minskoff's office manager, also repeatedly spoke to Daniel in an imitated English accent.  *Id.*  Melidones also randomly asked Daniel the meaning of large words.  *Id.* ¶ 4.  Daniel believed that Melidones did this to belittle him.  *Id.*

In March 2011, Daniel, a naturalized citizen, SAC Claim 4 ¶ 14, showed Melidones a copy of his birth certificate, stating that he was born in St. Vincent and the Grenadines. Melidones responded by asking him why he came to the United States rather than "stay in your own country."  SAC Claim 6 ¶ 1.

In July 2011, Melidones repeatedly came to Daniel's workstation podium and sang calypso, in a manner that Daniel felt was mocking his cultural and national origin as a Vincentian.  *Id.* ¶ 5.

Daniel alleges that T&M and Minskoff management knew about Melidones's behavior but did nothing.  *Id.* ¶ 6.

6

### F.      The Alleged Harassment Based on Race

In February 2011, during Daniel's first week on the job, Melidones told him that "building owners in the area prefer to hire white security personnel" and that "the only reason you got the job is because Bill Woods liked you.  It's mostly Blacks, Indians, Hispanics doing this type of job nowadays."  SAC Claim 4 ¶¶ 1–2.  Also that month, Melidones told Daniel, "Aren't you lucky to be making this type of money, I think I'm paying you too much."  *Id.* ¶ 3. Daniel, who was paid $20 per hour, believed that if he were white, Melidones would not have made this comment.  *Id.*

In March 2011, Melidones began telling Daniel that "you're not black."  *Id.* ¶ 4.  Daniel believed that Melidones said this because of his accent, physical mannerisms, and perceived national origin in England.  *Id.*

In July 2011, Melidones likened Daniel to a gorilla.  *Id.* ¶ 6.

In August 2011, before Daniel took the FDNY fire safety director exam, Melidones said to him, "you better pass the test or you're fired."  *Id.* ¶ 9.  When Melidones found out that Daniel had passed, he told Daniel "you're lucky."  *Id.*  Melidones fired an African-American co-worker of Daniel's, Larry Saunders, who failed the test.  *Id.* ¶ 10.  Daniel believes that if he and Saunders had been white males, Melidones would not have made those remarks, and would have given the Saunders a second opportunity to take the test.  *Id.* ¶¶ 11–12.

Also in August 2011, Melidones told Daniel, referring to a white female tenant named Barby Woodard, that "she likes you, you know she's dating a black man, she likes her meat dark and big."  *Id.* ¶ 13.

In September 2011, Melidones asked Daniel if he was "going to vote for your man Obama." *Id.* ¶ 14.  When Daniel informed Melidones that he was a registered Republican, Melidones replied, "you're, really, I guess you're alright after all."  *Id.*

In December 2011, a laptop was stolen from a building tenant, and security obtained a picture of the suspect, a black male with a bald head.  Melidones asked Daniel if he had stolen the laptop, saying that "I've a picture of a black male, with bald head that looks like you, after all you are a black male with a bald head." *Id.* ¶ 8.

Daniel alleges that T&M and Minskoff management knew of Melidones's behavior and did nothing. *Id.* ¶ 19.

**G.  Daniel's Termination**

On Friday, May 4, 2012, Greisch mentioned to Daniel that Bain Capital, a tenant, was planning to terminate an employee that day, and that Melidones would call Daniel later with more details.  SAC ¶ 40.  Melidones later called Daniel and told him that he should go speak to Bain's office manager to get more information about the person Bain fired.  *Id.* ¶ 41.  Instead of physically going to the Bain office on the 42nd floor, Daniel called Bain's office manager, who sounded confused by his inquiry.  *Id.* ¶ 42.  Less than a minute later, Melidones called Daniel back and screamed at him, "'who told you to call? who told you to call? You fucking idiot, shut the fuck up, don't say a fucking word you fucking idiot, nig' (nigger)." *Id.* ¶ 43.  Melidones then slammed the phone down and hung up.

The incident on May 4 made Daniel sick with fear.  *Id.*  He was afraid that he would lose his job and that if he lost his job he might become homeless.  *Id.*  He also believed that complaining would jeopardize his job. *Id.* ¶ 44.

On the next work day, Monday, May 7, 2012, Daniel asked Melidones for a day off.  *Id.* ¶ 44.  He seriously contemplated quitting, because he could not stand looking or being in Melidones's presence.  *Id.*  When he told Melidones of his intention to resign, Melidones encouraged him to quit.  *Id.*

The next day Daniel came into work was Tuesday, May 8, 2012.  At 4:15 p.m., as Melidones walked past Daniel's work podium, Melidones slapped Daniel "very, very hard on my right shoulder and said, 'man up, be a man!'"  *Id. ¶* 46.  At 4:20 p.m., two co-workers told Daniel that, the previous day, Melidones had made derogatory remarks about him and asked co-workers if Daniel was needed on the job and whether they knew of anything that Melidones could use to get Daniel fired.  *Id.* ¶ 47; SAC Claim 1 ¶ 36.  At 4:30 p.m., Daniel told Greisch, Minskoff's building manager, about the May 4 incident, to which Greisch replied, "I'll talk to [Melidones], I've spoken to him before about watching his words, I'll speak to him again."  SAC ¶ 48.

On May 7 or 8, 2012, Melidones deleted all sent emails from the computer at Daniel's workstation, many of which contained complaints by former employee Paul Sylvio to Greisch, Woods, and Melidones's boss at T&M about inappropriate ethnic comments and racial epithets that Melidones had directed at Sylvio.  SAC Claim 4 ¶ 18.

On Wednesday, May 9, 2012, at 12:39 a.m., Daniel sent Melidones a text message informing him that Daniel intended to report his harassment and intimidation to T&M.  SAC ¶ 49.  Later that day, at 4 p.m., Melidones served Daniel with a disciplinary letter that accused him of having unauthorized packages delivered to him at 590 Madison.  *Id.* ¶ 50; *id.* Ex. C, p. 7.  The letter further alleged that one such package contained an "imitation pistol," and that Daniel opened this package and showed the imitation pistol to several staff members.  *Id.* Ex. C, p. 7.

Melidones also orally accused Daniel of coming to work late two dozen times in the last two months.  *Id.* ¶ 50.  This was the first time Daniel had received a disciplinary warning from T&M. SAC Claim 1 ¶ 6.

On Monday, May 14, 2012, at 7:44 a.m., Melidones sent Daniel a text message telling him not to show up at work.  SAC ¶ 51.  On Friday, 18, 2012, Toni Scarito, T&M's Human Resources Director, told Daniel by telephone that he was fired because he was an at-will employee, he had violated T&M and Minskoff's policies, and he had had violated New York City Administrative Code § 10-131(b)(1) by possessing and selling toy air pistols and air rifles. SAC ¶ 52.

Daniel claims that the reasons given for his firing were pretextual.  SAC Claim 1 ¶ 10. He insists that his receipt and possession of the BB gun, which Amazon delivered to him at work on March 16, 2012, *Id.* ¶ 20, *id.* Ex. C., p. 29, was not illegal, SAC Claim 1 ¶¶ 22–26.  Daniel also asserts that the T&M Employee Handbook does not state that it is unacceptable for employees to accept deliveries at their worksite, SAC ¶ 53; that Melidones, Greisch, Woods, and others had long known that he had been receiving packages at 590 Madison, *id.* ¶ 55; and that contrary to T&M's later representation, he had not been told to stop ordering packages for delivery at his worksite, SAC Claim 1 ¶ 28.

### H.     The Emotional Impact on Daniel

Daniel alleges that these events caused him to suffer from depression, including strong suicidal thoughts, feelings of worthlessness, and feelings of defeat and powerlessness.  SAC Claim 8 ¶ 6.  In January 2012, his doctor prescribed him an anti-depressant medication, Celexa. *Id.* ¶ 7.  He also alleges that these events caused him to suffer severe panic attacks, physical fatigue, chest pains, migraine headaches, muscle weakness, sleep apnea, difficulty sleeping, and

a worsening of his preexisting high blood pressure condition.  *Id.* ¶¶ 7–10.  After losing his job, Daniel became homeless.  *Id.* ¶¶ 13–15.

### I.   Procedural History

On September 5, 2012, Daniel went to the Equal Employment Opportunity Commission ("EEOC") to file a complaint.  SAC ¶ 41.  Because his sexual orientation claims are cognizable under state but not federal law, the EEOC referred him to the New York State Division of Human Rights (DHR).  *Id.*  That same day, Daniel went to the DHR and filed a complaint against T&M and Melidones.  SAC p. 40.  He listed Melidones and Greisch under the heading "Individual people who discriminated against me."  *Id.*  On September 14, 2012, T&M responded.  SAC Ex. C, p. 1.  On March 4, 2013, DHR issued a letter concluding that there was no probable cause to believe that T&M had engaged in the unlawful practices of which Daniel complained.  SAC pp. 41–43.  On April 18, 2013, the EEOC adopted the DHR's findings and issued a "Right to Sue" letter.  *Id.* p. 44.

On June 24, 2013, Daniel filed the original complaint in this action.  Dkt. 2.  On August 19, 2013, he filed an Amended Complaint.  Dkt. 11.  On August 20, 2013, Daniel requested pro bono counsel.  Dkt. 12.  On September 10, 2013, the Court referred the case to Magistrate Judge Pitman for general pretrial supervision, Dkt. 22, and denied Daniel's application for pro bono counsel without prejudice to renewal, Dkt. 23.  On September 25, 2013, Minskoff moved to dismiss the Amended Complaint.  Dkt. 24.

On October 7, 2013, Daniel filed the SAC.  Dkt. 31.  It alleged that T&M and Minskoff had discriminated against him in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), New York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq.* ("NYSHRL"), and New York City Human Rights Law, N.Y. City Admin. Code §§ 8-101 *et*

*seq*. ("NYCHRL").  It alleged that their discriminatory conduct included termination, retaliation, and harassment, including sexual harassment.  The SAC alleged that defendants discriminated against him on the basis of race, sexual orientation, and national origin.  It also alleged that they violated the FMLA and committed common law negligence.

On October 28, 2013, Minskoff moved to dismiss the SAC, Dkt. 33, and filed an accompanying memorandum of law.  Dkt. 34 ("Def. Br.").  Minskoff argued that (1) this Court lacks jurisdiction to hear Daniel's Title VII claim against Minskoff, because Daniel filed his DHR and EEOC claims against only T&M, not Minskoff; (2) the Title VII, NYSHRL, NYCHRL, and FMLA claims should be dismissed because Minskoff was not Daniel's employer and because the SAC failed to adequately allege wrongdoing by Minskoff; (3) the common law negligence claim should be dismissed because Minskoff did not have a duty to protect Daniel, the SAC alleges no negligent conduct by Minskoff, and the SAC alleges only emotional harm; and (4) once both federal law claims are dismissed, the NYSHRL and NYCHRL claims should be dismissed for lack of jurisdiction,

On October 29, 2013, Daniel filed a three-page Affirmation in Opposition to Motion. Dkt. 36 ("Pl. Br.").  Later that day, the Court issued an Order clarifying that if Daniel wanted to supplement his opposition, he had until November 12, 2013 to do so.  Dkt. 37.  On November 4, 2013, Daniel filed a second Affirmation in Opposition.  Dkt. 38 ("Pl. Supp. Br.").  On November 26, 2013, Minskoff replied.  Dkt. 39 ("Def. Reply Br.").

On December 5, 2013, Daniel again requested pro bono counsel.  Dkt. 40.  On December 9, 2013, Magistrate Judge Pitman denied Daniel's request for pro bono counsel.  Dkt. 41.

## II.      Applicable Legal Standards

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed, where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. Accordingly, a district court must accept as true all well-pleaded factual allegations in the complaint, and draw all inferences in the plaintiff's favor. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). However, that tenet "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. A pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

District courts are "obligated to construe *pro se* complaint[s] liberally," *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009), interpreting them "to raise the strongest arguments that they suggest," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006). Courts may not, however, read into *pro se* submissions claims inconsistent with the *pro se* litigant's allegations, *Phillips v. Girdich*, 408 F.3d 124, 127 (2d Cir. 2005) (citation omitted), or arguments that the submissions themselves do not "suggest," *Pabon v. Wright,* 459 F.3d 241, 248 (2d Cir. 2006). *Pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law." *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir. 1983) (citation omitted).

III.     **Discussion**

    A.      **Daniel's Failure to Name Minskoff in his DHR Complaint**

Minskoff argues that Daniel's Title VII claim should be dismissed because the complaint he lodged with the DHR failed to name Minskoff. "A complainant must file a charge against a party with the EEOC or an authorized state agency before the complainant can sue that party in federal court under Title VII." *Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 619 (2d Cir. 1999) (citing 42 U.S.C. § 2000e–5(f)(1), which limits the aggrieved party's right to sue to "the respondent named in the charge"). "The charge serves to notify the charged party of the alleged violation and also brings the party before the EEOC, making possible effectuation of the Act's primary goal of securing voluntary compliance with its mandates." *Id.* (citation omitted).

The charge that Daniel filed with the DHR did not name Minskoff. SAC p. 40. Daniel concedes as much. Pl. Supp. Br. ¶ VIII. Similarly, the EEOC's "Right To Sue" letter, which adopted the DHR's findings, included only T&M as a respondent. SAC p. 41.

Contrary to Minskoff's suggestion, however, Daniel's failure to literally name Minskoff in his DHR charge does not end the matter. "Because these charges generally are filed by parties not versed in the vagaries of Title VII and its jurisdictional and pleading requirements, [the Second Circuit has] taken a flexible stance in interpreting Title VII's procedural provisions, so as not to frustrate Title VII's remedial goals." *Johnson v. Palma*, 931 F.2d 203, 209 (2d Cir. 1991) (citation omitted). "Thus, courts have recognized an exception to the general rule that a defendant must be named in the EEOC complaint." *Id*. "This exception, termed the 'identity of interest' exception, permits a Title VII action to proceed against an unnamed party where there is a clear identity of interest between the unnamed defendant and the party named in the administrative charge." *Id.*; *accord Pajooh v. Dep't of Sanitation*, No. 12-4252-CV, 2013 WL

6570706, at *1 (2d Cir. Dec. 16, 2013). The Second Circuit has recognized four factors that should be considered in determining whether an identity of interests exists:

> 1) whether the role of the unnamed party could through reasonable effort by the complainant be ascertained at the time of the filing of the EEOC complaint; 2) whether, under the circumstances, the interests of a named party are so similar as the unnamed party's that for the purpose of obtaining voluntary conciliation and compliance it would be unnecessary to include the unnamed party in the EEOC proceedings; 3) whether its absence from the EEOC proceedings resulted in actual prejudice to the interests of the unnamed party; 4) whether the unnamed party has in some way represented to the complainant that its relationship with the complainant is to be through the named party.

*Vital*, 168 F.3d at 619 (quoting *Johnson*, 931 F.2d at 209–10). "In addition to these four factors, numerous courts have found that the Second Circuit in *Johnson* had also implied that another consideration is relevant to the identity-of-interest inquiry—whether, although not named as a respondent in the caption, the defendant is named in the body of the charges as having played a role in the discrimination." *Zustovich v. Harvard Maint., Inc.*, 73 Fed. R. Serv. 3d 462, at *8 (S.D.N.Y. 2009); *accord Hanley v. Chicago Title Ins. Co.*, 12 No. Civ. 4418 (ER), 2013 WL 3192174, at *5 (S.D.N.Y. June 24, 2013); *Tout v. Erie Comm. College*, 923 F. Supp. 13, 16 (W.D.N.Y. 1995); *Bridges v. Eastman Kodak Co.*, 822 F. Supp. 1020, 1025 (S.D.N.Y. 1993); *see Johnson*, 931 F.2d at 210 (distinguishing a case in which the court allowed a defendant to be sued although not named in the agency complaint because "several factual statements in the EEOC complaint could be read to afford notice" from the instant case, in which "[t]he factual statements in Johnson's [agency] complaint do not implicate the [defendant] in any way"). "This multi-factor test is not a mechanical one, and no single factor is dispositive." *Zustovich*, 73 Fed. R. Serv. 3d 462, at *8.

The first factor weighs against Daniel, because he was fully aware of Minskoff's role at the time he filed his charge.  For example, he listed Greisch on the complaint form under the heading "Individual people who discriminated against me."  SAC p. 40.

The second factor, similarity of interests, weighs in Daniel's favor.  It is true that Minskoff and T&M are separate entities, with generally distinct interests.  Minskoff is not an "agent[] or employee[]" of T&M.  *See Tout*, 923 F. Supp. at 16.  But Minskoff has contractually delegated to T&M substantial responsibility for the security of 590 Madison, including staffing decisions.  Thus, "for the purpose of obtaining voluntary conciliation and compliance" in Daniel's case, "it would be unnecessary to include" Minskoff in the DHR proceedings.  *Vital*, 168 F.3d at 619.  For the purposes of that proceeding, the interests of Minskoff and T&M were similar.  In addition, T&M and Minskoff's later use of common legal counsel in these proceedings, *see* Dkt. 7, 17, evidences their shared interest.  *See Hanley*, 2013 WL 3192174, at *5; *Wills v. Key Food Stores Co-operative, Inc.*, No. 95 Civ. 5333 (SJ), 1997 WL 168590, at *7 (E.D.N.Y. Apr. 9, 1997); *Goyette v. DCA Advertising, Inc.*, 830 F. Supp. 737, 748 (S.D.N.Y. 1993).

The third factor also favors Daniel:  Minskoff was not prejudiced by its absence from the DHR proceeding, because the DHR took no action to remedy Daniel's complaint.  *See Zustovich*, 73 Fed. R. Serv. 3d 462, at *9 ("Courts have found the third factor of the identity-of-interest analysis to be satisfied where the agency in which the plaintiff filed his or her administrative charge took no conciliatory action.").  In addition, Minskoff has made no showing of actual prejudice.

The fourth factor also weighs in Daniel's favor, because Minskoff had represented to Daniel that its relationship with him was to be through T&M.  The pleadings do state that Daniel

worked in concert with both Minskoff and T&M staff.  But, as to hiring, firing, and related

employment matters, the SAC pleads that his employment relationship was directly with T&M,

and any relationship with Minskoff was only indirect.  *See* SAC ¶¶ 32 (hiring by T&M), 52

(firing by T&M), Ex. I p. 5 (email from Greisch to Daniel stating that, "[u]nfortunately there is

not anything I can do regarding your termination of employment here at 590 as it was a T&M

issue").  Indeed, Minskoff has cited to these pleadings, without disagreement, in an effort to

show that it was not Daniel's employer.  *See* Def. Br. 17 (summarizing, without disagreeing, that

"Plaintiff alleges that he was hired by T&M, disciplined by T&M, paid by T&M and fired by

T&M.  Plaintiff does not allege that Minskoff exercised authority to make any employment

decisions with respect to Plaintiff.") (citations omitted).  Thus, on the record before it the Court

finds that Minskoff had represented to Daniel that its relationship with him was to be through

T&M.  *See also Zustovich*, 73 Fed. R. Serv. 3d 462, at *9 ("In this case, the affiliation among

Sage, SPC and Harvard was in the nature of a contactor-subcontractor relationship.  This in itself

is likely sufficient, at this early stage, to satisfy the fourth factor.").

   As to the fifth factor, although the Court does not have the body of Daniel's charges

before it, the single-page complaint form lists Greisch, along with Melidones, under the heading

"Individual people who discriminated against me," and gives his title, "property manager."  SAC

p. 40.  "Although individuals may not be held liable under Title VII, the naming of [Greisch],

a[ ] [Minskoff] employee, in the agency complaint should have given [Minskoff] notice that it

was potentially liable for [Greisch's] conduct."  *Zustovich*, 73 Fed. R. Serv. 3d 462, at *9.

   After carefully considering these five factors, four of which weigh in Daniel's favor, the

Court concludes that, in the administrative proceeding, there was a sufficient identity of interest

between T&M and Minskoff such that Daniel's failure to name Minskoff as a respondent in the

administrative proceeding should not bar him from naming Minskoff as a defendant in his Title

VII claim before this Court.  Daniel's failure may have deprived Minskoff of actual notice—the

record before this Court does not make clear whether T&M actually notified Minskoff of

Daniel's complaint against T&M—but it did not undermine "the Act's primary goal of securing

voluntary compliance with its mandates."  *Vital*, 168 F.3d at 619.  Accordingly, the Court denies

Minskoff's motion to dismiss the Title VII claim for failure to exhaust administrative remedies.[2]

### B.      Minskoff's Status as Daniel's Employer

Minskoff next argues that the Title VII, NYSHRL, NYCHRL, and FMLA claims should

be dismissed because such claims can be brought only against an employer, and Minskoff was

not Daniel's employer.  Again, at first blush, Minskoff's argument has appeal:  It was never,

literally, Daniel's employer.  But, once again, Minskoff does not raise or seek to rebut the

relevant exception to this rule, here, the joint employer doctrine, under which "an employee,

formally employed by one entity, who has been assigned to work in circumstances that justify

the conclusion that the employee is at the same time constructively employed by another entity,

may impose liability for violations of employment law on the constructive employer, on the

theory that this other entity is the employee's joint employer."  *Arculeo v. On-Site Sales & Mktg.,*

*LLC*, 425 F.3d 193, 198 (2d Cir. 2005).

---

[2] "Some courts, including district courts in this Circuit, have also recognized a separate exception
to the requirement that a party be named in the administrative complaint in cases in which, from
the facts in the EEOC charge, 'the agency could have inferred the named defendant and unnamed
defendant were part of a common discriminatory scheme.'"  *Zustovich*, 73 Fed. R. Serv. 3d 462,
at *7 n.3 (quoting *Bright v. Le Moyne College*, 306 F. Supp. 2d 244, 257 (N.D.N.Y. 2004)); *see
also Glus v. G.C. Murphy Co.*, 562 F.2d 880, 888 (3d Cir. 1977), *cert denied*, 449 U.S. 949
(1980)); *Coleman v. Bd. of Educ.*, No. 96 Civ. 4293 (LAP), 1997 WL 452029, at *3 (S.D.N.Y.
Aug. 7, 1997); *Gilmore v. Local 295*, 798 F. Supp. 1030, 1038 (S.D.N.Y. 1992), *aff'd*, 23 F.3d
396 (2d Cir. 1994).  Because the Court finds that T&M and Minskoff had a sufficient identity of
interest in the administrative proceedings, it need not reach this issue.

The joint employer inquiry is "functional[ ]," *see Laurin v. Pokoik*, No. 02 Civ. 1938 (LMM), 2004 WL 513999, at \*8 (S.D.N.Y. Mar. 15, 2004), and factual, *see id.* at \*4–\*9 (fact questions existed as to whether sole proprietorship where plaintiff worked and corporation that employed proprietor were single employer and/or joint employers); *Nelson v. Beechwood Org.*, No. 03 Civ. 4441 (GEL), 2004 WL 2978278, at \*4–\*5 (S.D.N.Y. Dec. 21, 2004) (fact question existed as to whether subcontractor and contractor were functionally joint employers of plaintiff). "Here, courts look at commonality of hiring, firing, discipline, pay, insurance, records, and supervision to determine whether an entity is a joint employer." *Lima v. Addeco*, 634 F. Supp. 2d 394, 400 (S.D.N.Y. 2009) *aff'd sub nom. Lima v. Adecco &/or Platform Learning, Inc.*, 375 F. App'x 54 (2d Cir. 2010) (citations omitted). "The joint employer doctrine has been applied to temporary employment or staffing agencies and their client entities; it has also been applied to contractors and subcontractors and other scenarios where two separate entities have control over an employee's employment." *Id.*

The SAC alleges, and at this stage the Court must take as true, that Minskoff exercised a measure of control over the hiring, firing, supervision, leave, and discipline of T&M employees working at 590 Madison. *See* SAC ¶ 31 (Minskoff "often asserts its authority to terminate and/or hire security personnel at 590 Madison Ave"). Daniel alleges that he believes that the job he interviewed for at 590 Madison was available because Minskoff had demanded the termination of his predecessor. SAC Claim 4 ¶ 2. And before Daniel could begin working at 590 Madison, he was interviewed by Woods, Minskoff's assistant property manager. SAC ¶ 34. Once hired, Daniel would, with some frequency, provide updates on work matters to Woods and Greisch, Minskoff's property manager. SAC ¶ 23; *id.* Ex. A. pp. 5, 9–11. Indeed, Melidones, Daniel's direct supervisor and a T&M employee, sat in the Minskoff management office on the 26th floor.

*Id.* ¶ 5.  Greisch would sometimes intervene on Daniel's behalf with Melidones, instructing him to grant Daniel days off when sick, *id.* Claim 7 ¶ 1, and, after Melidones's May 4 alleged racially charged explosion, telling Daniel that "I'll talk to [Melidones], I've spoken to him before about watching his words, I'll speak to him again," SAC ¶ 48.  And Melidones often conferred with Greisch and Wood before disciplining security personnel at 590 Madison.  SAC Claim 1 ¶ 13.

By means of these detailed allegations, the SAC adequately pleads that Minskoff and T&M were joint employers.  This is especially true in light of this Court's obligation "to construe *pro se* complaint[s] liberally," *Harris*, 572 F.3d at 72, interpreting them "to raise the strongest arguments that they suggest," *Triestman*, 470 F.3d at 474.  The Court therefore denies Minskoff's motion to dismiss the Title VII and FMLA claims for lack of an employer-employee relationship.

### C.    The SAC's Allegations Against Minskoff

Minskoff next argues that the Title VII, NYSHRL, NYCHRL and FMLA claims against Minskoff should be dismissed because the SAC does not allege any wrongdoing, adverse employment actions, or denials of leave by Minskoff.  Ironically, these arguments by Minskoff as to Daniel's asserted threadbare pleading are themselves so sparse as to be barely noticeable. *See* Def. Br. 13, 17 n.5, 19 n.6.

The SAC does not specifically allege that any personnel clearly employed by Minskoff, such as Woods or Greisch, were involved in Daniel's termination or denials of leave.  As to Minskoff and these men, the SAC merely alleges that they were sometimes involved in hiring and firing T&M personnel, and that they could have prevented Daniel's firing, but not that they were involved in causing Daniel's firing.  The SAC also alleges in general terms that, with respect to the May 4 incident with Bain Capital, Daniel believes that he was "set up" by

20

Melidones and Greisch, SAC 4 ¶ 16, and that Melidones "and or" Greisch denied or delayed approval for him to take off work for family and medical reasons, SAC Claim 7 ¶ 3, but these allegations are so vague and conclusory that they cannot be the basis for a reasonable inference that Minskoff is liable for the misconduct alleged.

However, although the SAC is far from clear on this matter, there is a basis to read it to allege that Melidones, who it plainly alleges had a hand in Daniel's termination and denial of leave, was an agent or employee of Minskoff as well as T&M.  On the one hand, the SAC implies that Melidones was, at least, primarily affiliated with T&M.  The SAC states that T&M is Melidones's "direct employer," SAC Claim 8 ¶ 3, and implies that he is a member of T&M's management team, SAC ¶ 54.  Melidones's boss works for T&M.  SAC Claim 4 ¶ 18.  The SAC also includes a letter that Melidones wrote, on T&M letterhead, to the security staff at 590 Madison, which casts him as part of T&M.  The letter begins "Congratulations!!! T and M Protection has been awarded the contract here at 590 Madison for another year.  This will be *our* 6th year, as most of you know in world of New York City Security Services this is unheard of. In keeping with *our* commitment of excellence, I believe *we* must 'tighten up' or increase *our* focus on *our* services here at 590."  SAC Ex. I p. 3 (emphases added).  The letter concludes, "I cannot let the action of a few employees jeopardize the whole staff."  *Id.*

On the other hand, the SAC also suggests that Melidones may have played a dual role. The SAC states that Melidones's job titles are "(1) security director (EJME) [Minskoff], (2) account manager / supervisor (T&M), and (3) fire safety / EAP dir[rector] (EJME) [Minskoff]." *Id.* ¶ 24.[3]  Other portions of the SAC refer to Melidones using Minskoff titles.  *See* SAC Claim 1 ¶ 4 ("African American and Hispanic security personnel were and I believe still are unfairly

---

[3] The SAC uses the acronym EJME to refer to Edward J. Minskoff Equities (Minskoff).  SAC ¶ 1.

targeted by T&M onsite account manager and EJME security director Mr. John Melidones and

EJME property manager Mr. Joseph Griesch."); *id.* ¶ 17 (referring to Melidones as a member of

T&M's disciplinary committee and "EJME security director/deputy fire safety/EAP director and

T&M account manager"); *cf.* SAC ¶ 34 (somewhat ambiguously referring to Melidones's title as

follows: "Tom Dolan sent me to 590 Madison Avenue to be interviewed by EJME assistant

property manager Mr. William Woods and security director Mr. John Melidones.").

In sum, the SAC can fairly be read to plead that Melidones was an agent of Minskoff, and

it certainly alleges that Melidones was involved in T&M's decision to fire Daniel.  Accordingly,

the Court cannot conclude that the SAC fails to state claims against Minskoff for violations of

Title VII, NYSHRL, NYCHRL, and the FMLA.  Minskoff's motion to dismiss these claims is

therefore denied.

### D.    Negligence

Finally, Minskoff moves to dismiss Daniel's last claim, for common law negligence, on

the grounds that, *inter alia*, allegations of employment discrimination cannot be transmuted into

tort claims sounding in negligence.  Def. Br. 20–21.  As to this point, Minskoff is correct.

Daniel's negligence claim is essentially that T&M and Minskoff failed to protect him from

Melidones's harassment and then retaliated against him.  SAC Claim 8 ¶¶ 1–16.  But this is no

different from his employment discrimination claims under Title VII, NYSHRL, and NYCHRL.

And "the alleged violations of federal, state, and city anti-discrimination laws are not torts under

New York law."  *Baguer v. Spanish Broad. Sys., Inc.*, No. 04 Civ. 8393 (KMK), 2007 WL

2780390, at *4 (S.D.N.Y. Sept. 20, 2007); *accord Treanor v. Metro. Transp. Auth.*, 414 F. Supp.

2d 297, 303 (S.D.N.Y. 2005) ("New York cases reason [ ] that a discrimination claim is not a tort

because it is 'a new statutory cause of action which was not cognizable at common law.'"

(quoting *Picciano v. Nassau Co. Civil Serv. Comm'n*, 736 N.Y.S.2d 55, 60 (2nd Dep't 2001)).

Accordingly, Minskoff's motion to dismiss the negligence claim is granted.

## CONCLUSION

Minskoff's motion to dismiss the SAC is denied as to the Title VII, FMLA, NYSHRL, and NYCRL claims against it, and granted as to the negligence claim. Because the Court denies Minskoff's motion to dismiss the Title VII claim, it need not address Minskoff's argument that, were the Court to dismiss the Title VII claim, it should decline to exercise supplemental jurisdiction over the state law claims.

The Clerk of Court is respectfully directed to terminate the motions pending at docket numbers 24 and 33.


SO ORDERED.

*Paul A. Engelmayer*
_____
Paul A. Engelmayer
United States District Judge


Dated: January 15, 2014
New York, New York