UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2/19/2015
```

------------------------------------------------------------------------X
                                                    :
OTIS A. DANIEL,                                     :
                                  Plaintiff,        :
                                                    :          13 Civ. 4384 (PAE)
              -v-                                   :
                                                    :          OPINION & ORDER
T&M PROTECTION RESOURCES LLC,                       :
                                                    :
                                  Defendant.        :
                                                    :
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

    *Pro se* plaintiff Otis Daniel, a former fire safety director at 590 Madison Avenue in

Manhattan ("590 Madison") brings claims of discrimination against the company that directly

employed him there, T&M Protection Resources ("T&M").  Daniel alleges that he was subjected

to a hostile work environment throughout his employment and ultimately terminated because of

his race, perceived national origin, and/or perceived sexual orientation, and/or in retaliation for

his complaints about the discriminatory treatment he experienced, in violation of Title VII of the

Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and New York State and New

York City anti-discrimination statutes.  Daniel also alleges that T&M violated the Family and

Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, by denying him medical leave, and

committed common law negligence by subjecting him to the discriminatory conduct of the

building's security director.

    Pending now is T&M's motion for summary judgment on all claims pursuant to Federal

Rule of Civil Procedure 56.  For the following reasons, T&M's motion is granted.

## I.   Background[1]

### A.   Daniel's Employment at T&M

Daniel is a 34-year-old black man from St. Vincent and the Grenadines, a small island in the Caribbean.  Daniel Dep. 9–10.  He moved to the United States at age 13.  *Id.* at 10.  Daniel identifies as gay, although he did not disclose his sexual orientation to his supervisors or co-workers at T&M.  *Id.* at 247–48.

Daniel has worked as a security guard since 2005.  *Id.* at 13.  In late 2010, Daniel responded to an online advertisement for a fire safety director position with T&M, *id.* at 46–47, a global security and investigations firm based in New York City, T&M 56.1 ¶ 1.  Tom Dolan, a T&M recruiter, interviewed Daniel and accepted his application.  Daniel Dep. 46–47.  To obtain a site assignment for Daniel, Dolan sent him to interview with various T&M clients including the managers of the UBS building and 590 Madison.  *Id.* at 47–48.

At 590 Madison, Daniel interviewed with John Melidones, the security director, and Bill Wood, the assistant property manager.  *Id.* at 48–51.  About a week later, Dolan informed Daniel

---

[1] This account of the facts is drawn from the parties' submissions in support of and in opposition to T&M's motion for summary judgment, including Daniel's Second Amended Complaint ("SAC") (Dkt. 31); the Affidavit of Steven I. Gutstein in Support of T&M's Motion for Summary Judgment ("Gutstein Aff.") (Dkt. 67); the Affidavit of John Melidones in Support of T&M's Motion for Summary Judgment ("Melidones Aff.") (Dkt. 68); the Affidavit of Clinton Lisk in Support of T&M's Motion for Summary Judgment ("Lisk Aff.") (Dkt. 69); the Affidavit of Carmen Negron in Support of T&M's Motion for Summary Judgment ("Negron Aff.") (Dkt. 70); T&M's Rule 56.1 Statement ("T&M 56.1") (Dkt. 71); the Declaration of Meredith Cavallaro in Support of T&M's Motion for Summary Judgment ("Cavallaro Decl.") (Dkt. 73), and the attached transcript of Daniel's deposition ("Daniel Dep."); Daniel's Affirmation in Opposition to T&M's Motion for Summary Judgment ("Daniel Aff.") (Dkt. 75); Daniel's Sur-Reply in Further Support of his Opposition to T&M's Motion for Summary Judgment ("Daniel Sur-Reply"), which includes Daniel's Rule 56.1 Statement ("Daniel 56.1") (Dkt. 93); and the Declaration of Leonard Weintraub in Support of T&M's Motion for Summary Judgment ("Weintraub Decl.") (Dkt. 98).  Citations to a party's 56.1 Statement incorporate by reference the documents cited therein.

that he had gotten the job.  *Id.* at 49.  Daniel replaced a white Caucasian male who had been fired

for being rude to tenants.  *Id.* at 81.  In February 2011, Daniel began working at 590 Madison as

an at-will employee.  *Id.* at 52; SAC p. 13.  Melidones was his direct supervisor.  *Id.* at 166.

Daniel initially worked the day shift, from 8 a.m. to 4 p.m.  Daniel Dep. 51.  Throughout

Daniel's employment, Melidones also worked during the day, from 7 a.m. to 3 p.m.  *Id.* at 55.

Daniel testified that he experienced significant harassment based on his race, perceived

national origin, and perceived sexual orientation.  During Daniel's first week on the job, for

example, Melidones told him that property managers near 590 Madison generally "prefer to hire

white security personnel" and that he was "paying [Daniel] too much."  *Id.* at 81, 103.  Another

incident occurred in July 2011, when Melidones told Daniel "smile; you look like a gorilla; why

the angry face, smile."  *Id.* at 90.  Daniel also testified that, in addition to various other racially

motivated comments and behaviors, Melidones made statements related to his (incorrect) belief

that Daniel is from England:  He imitated Daniel's accent, asked Daniel to define large words,

and told Daniel to "go back to England."  *Id.* at 91, 92, 109.  According to Daniel, Melidones

also harassed Daniel based on his perception that Daniel is gay:  In June or July 2011, for

example, Melidones brushed up against Daniel's buttocks, asked about Daniel's sexual

orientation, and informed Daniel that his son is gay.  *Id.* at 230.

In September 2011, Daniel transferred to the night shift and began working from 4 p.m.

to 12 a.m.  *Id.* at 57–58.  Because Melidones continued to work from 7 a.m. to 3 p.m., Daniel

saw Melidones in person less frequently and for shorter periods of time.  *See id.* at 67–68, 71,

150.  However, Daniel testified that Melidones's harassment continued.  In March 2012, for

example, Melidones called Daniel around 6 or 7 p.m. and told him "I am at the Broadway show

Mary Poppins. . . .  I can see you as Mary Poppins; you will make a good Mary Poppins."  *Id.* at

234.  Similarly, on one occasion in May 2012, Melidones slapped Daniel on the back and said "man up, be a man."  *Id.* at 149.  Melidones categorically denies using any discriminatory language or otherwise harassing Daniel.  Melidones Aff. ¶ 9.

Tensions between Daniel and Melidones came to a head on Friday, May 4, 2012.  On that date, Melidones instructed Daniel to go upstairs to Bain Capital and speak with Bain's office manager about an employee who was going to be terminated.  Daniel Dep. 112.  Instead of going upstairs to the Bain office, Daniel called the office manager on the telephone.  *Id.* at 113.  Seconds later, Melidones called Daniel and launched into a "screaming, belligerent, profanity-laced tirade."  *Id.* at 114.  In the course of berating Daniel, Melidones called him a "fucking idiot" and "fucking nigger."  *Id.* at 114–15.

On Monday, May 7, 2012, Daniel remained extremely upset about Melidones's conduct and felt physically unable to go to work.  *See id.* at 117.  Accordingly, he sent Melidones a text message claiming that he was sick.  *Id.*  No other fire safety directors were available that day, so Melidones worked Daniel's shift himself.  Melidones Aff. ¶ 18.  During the shift, a mail delivery person attempted to deliver a package for Daniel.  *Id.*  Because T&M forbids security guards from receiving mail or packages at their worksites, Melidones rejected the delivery and commenced an investigation.  *Id.* ¶¶ 18–20.  From speaking with other security guards, Melidones learned that Daniel had received multiple packages at the worksite, including a BB gun that had been delivered in March 2012.  *Id.* ¶ 20.

On May 8, 2012, Daniel returned to work and learned about Melidones's investigation. Daniel Dep. 122, 205.  Late that night, he sent Melidones a text message that said:

> I'd like to claim my sick day for yesterday 5/7/12.  I understand you've a personal vendetta against me for maybe what transpired on Friday 5/4/12 with Bain Capital and me taking off yesterday due to illness.  If this is the case John, please address it with T&M.  The use of intimidation, threats, manipulation and lying about an

employee causing him/her to resign or be terminated is unwarranted and
unprofessional.  I will be notifying T&M of your tactics.

*Id.* at 150–51; Daniel Sur-Reply, Ex. 2, at 58–60.  The next day, May 9, 2012, Melidones served

Daniel with a disciplinary write-up accusing him of having packages delivered to the worksite,

including a package containing an imitation pistol.  Daniel Dep. 207–08.

Daniel acknowledges that he had personal packages delivered to 590 Madison.  *See, e.g.*,

*id.* at 197 (discussing 17 packages Daniel had delivered to 590 Madison); SAC p. 16 ("I did not

and will not dispute having personal packages delivered to the worksite.").  He also concedes

that the items delivered to his worksite included a Smith & Wesson BB gun that looked like a

real gun, Daniel Dep. 177, 201, and that his possession of the BB gun may have run afoul of

T&M's firearms policy, *id.* at 168–69, 174–75.  In his defense, Daniel argues that he was not

aware of T&M's unwritten policy prohibiting employees from receiving personal packages at

work.  *Id.* at 172.  In fact, he testified, Melidones had affirmatively authorized his receipt of

personal packages at 590 Madison.  *Id.* at 183–85.  Daniel also testified that he ordered a "toy

gun" and had no idea that it would look so realistic or would qualify as a firearm.  *Id.* at 177.

On May 15, 2012, Daniel appeared before a disciplinary committee composed of

Melidones and four other T&M executives.  *Id.* at 215.  Daniel attempted to prove that

Melidones had known about his personal package deliveries all along and was simply looking for

an excuse to terminate him.  *Id.* at 215–16.  The committee was unreceptive to his arguments and

recommended that Daniel be terminated.  *Id.* at 216–17, 230; Gutstein Aff. ¶ 26.

On May 18, 2015, T&M's human resources director Toni Scarito notified Daniel of his

termination via telephone.  Gutstein Aff. ¶ 27.  A "separation of service" form completed by

Melidones states that Daniel "was having his personal pkgs and mail delivered to the lobby of his

worksite" and "accepted delivery of an extremely realistic looking Smith and Wesson BB Gun."

Daniel Sur-Reply, Ex. 22, at 192.

**B.     The DHR and EEOC Actions**

On September 1, 2012, Daniel filed a complaint with the Equal Employment Opportunity

Commission ("EEOC").  *Id.* at 125–28.  He asserted claims of discrimination based on race,

national origin, sex, and sexual orientation as well as a claim of retaliation.  *Id.*  Because his

sexual orientation claims are cognizable under state but not federal law, the EEOC referred him

to the New York State Division of Human Rights ("DHR").  SAC p. 21.

On September 5, 2012, Daniel filed a complaint with the DHR.  Daniel Sur-Reply, Ex.

22, at 16–20.  He asserted claims of discrimination based on race, national origin, and sexual

orientation as well as claims of retaliation and sexual harassment.  *Id.*  T&M responded that

Daniel had been terminated due to his unauthorized package deliveries and possession of a

weapon.  *Id.* at 131–35.  Based on documentary submissions from Daniel and T&M, DHR

concluded that Melidones's statements "may rise to a certain level of insensitivity but not to an

actionable degree under discrimination law" and found that T&M had articulated "legitimate and

nondiscriminatory business reasons" for Daniel's termination that were neither "pretextual nor

otherwise unworthy of credence."  *Id.* at 3–5.  On March 4, 2013, the agency therefore issued a

determination of "no probable cause" for the allegations in Daniel's complaint.  *Id.* at 3.  The

DHR's order notified Daniel that he could appeal the agency's decision to the New York

Supreme Court within 60 days.  *Id.* at 4–5.

On April 18, 2013, the EEOC adopted the DHR's findings and closed its file on Daniel's

complaint.  SAC p. 44.  It also issued a "Right to Sue" letter, notifying Daniel that he could file

suit in federal or state court within 90 days.  *Id.*

###### C.      Procedural History of this Action

On June 24, 2013, Daniel filed the original complaint in this action.  Dkt. 2.  He named

both T&M and Edward J. Minskoff Equities ("Minskoff"), the company that manages the 590

Madison property, as defendants.  *Id.*  On August 19, 2013, Daniel filed an Amended Complaint.

Dkt. 11.  On September 25, 2013, Minskoff moved to dismiss the Amended Complaint.  Dkt.

24–26.  On October 7, 2013, Daniel filed the SAC.  Dkt. 31.

On October 28, 2013, Minskoff moved to dismiss the SAC.  Dkt. 33–34.  Minskoff

argued, among other things, that: (1) this Court lacks jurisdiction to hear Daniel's Title VII claim

against Minskoff because Daniel filed his DHR and EEOC claims against only T&M, not

Minskoff; (2) the federal and state statutory claims should be dismissed because Minskoff was

not Daniel's employer and because the SAC failed to adequately allege wrongdoing by

Minskoff; and (3) the common law negligence claim should be dismissed because Minskoff did

not have a duty to protect Daniel, the SAC alleges no negligent conduct by Minskoff, and the

SAC alleges only emotional harm.

On January 15, 2014, after briefing, the Court granted Minskoff's motion as to Daniel's

negligence claim but denied it as to all other claims.  Dkt. 43, *reported at Daniel v. T & M Prot.*

*Res., Inc.*, 992 F. Supp. 2d 302 (S.D.N.Y. 2014).  The Court held, *inter alia*, that the SAC

contained sufficient factual allegations to support a plausible inference that Minskoff and T&M

jointly employed Daniel and that Melidones was an agent of both companies, such that Minskoff

could be held liable for Melidones's discriminatory conduct.  *Id.* at 19, 21.  As to Daniel's

negligence claim, however, the Court noted that "allegations of employment discrimination

cannot be transmuted into tort claims sounding in negligence."  *Id.* at 22.  The Court therefore

dismissed Daniel's negligence claim, while preserving his federal and state employment discrimination claims.

On January 29, 2014, the Court granted Daniel's application for pro bono counsel and directed the Office of Pro Se Litigation to seek limited discovery counsel for him.  Dkt. 44.  On February 11 and March 10, 2014, two attorneys filed notices of appearance indicating that they would serve as pro bono counsel for Daniel.  Dkt. 45, 50.  In late April 2014, however, Daniel directed his counsel to withdraw and informed the Court that he had decided to proceed *pro se*.  Dkt. 53–54, 56.  On May 2, 2014, the Court authorized pro bono counsel's withdrawal.  Dkt. 57.

On May 9, 2014, Daniel and Minskoff submitted a stipulation of dismissal for the Court's approval.  Dkt. 61.  On May 12, 2014, the Court so-ordered the stipulation.  Dkt. 62.

Several months later, on November 13, 2014, Daniel sought to vacate the stipulation of dismissal.  Dkt. 100.  Daniel argued that he was "misled into believing that [Minskoff] as a matter of law could not be held fully liable for any of [his] claims alleged because [Minskoff] was not [his] or [his supervisor's] direct employer" and that he "did not understand the meaning of dismissal with 'prejudice'" *Id.* at 1.  In response, counsel for Minskoff produced their email correspondence with Daniel, which unambiguously demonstrated that they had not behaved improperly in procuring the settlement agreement.  *See* Dkt. 102–03.  The Court therefore denied Daniel's motion to vacate the stipulation of dismissal with Minskoff.  Dkt. 105.

On July 31, 2014, T&M—the sole remaining defendant—moved for summary judgment.  Dkt. 65, 66 ("T&M Br.").  At Daniel's request, the Court approved an expedited briefing schedule.  Dkt. 78.  On August 4, 2014, Daniel submitted his opposition.  Dkt. 75 ("Daniel Aff.").  On August 21, 2014, T&M filed its reply.  Dkt. 80 ("T&M First Reply").  On September 9, 2014, Daniel requested permission to file a sur-reply, Dkt. 90, and the Court granted his

motion, Dkt. 91.  On September 23, 2014, Daniel filed his sur-reply.  Dkt. 93 ("Daniel Sur-Reply").  And on October 23, 2014, T&M filed its second reply in support of its motion for summary judgment.  Dkt. 97–98 ("T&M Second Reply").

## II.    Applicable Legal Standards

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The movant bears the burden of demonstrating the absence of a question of material fact.  In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party.  *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

To survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  Those materials "'must be admissible themselves or must contain evidence that will be presented in admissible form at trial.'"  *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169–70 (2d Cir. 2014) (quoting *Santos v. Murdock*, 243 F.3d 681, 683 (2d Cir. 2001)).  "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," because "conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (alterations in original) (citation omitted).  Only disputes over "facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, the Court is "'required to resolve all ambiguities and draw all

permissible factual inferences in favor of the party against whom summary judgment is sought.'" *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (per curiam) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

In considering T&M's motion, the Court is mindful that Daniel is a *pro se* litigant whose submissions must be construed to "raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam) (citation and emphasis omitted). However, this forgiving standard "does not relieve plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003) (citation omitted). "[B]ald assertion[s]" by a *pro se* litigant, "'completely unsupported by evidence, [are] not sufficient to overcome a motion for summary judgment.'" *Geldzahler v. N.Y. Med. Coll.*, 746 F. Supp. 2d 618, 620 n.1 (S.D.N.Y. 2010) (quoting *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995)).

## III.   Discussion

Daniel asserts numerous claims under federal and state law. The Court first addresses Daniel's state and city statutory claims, which the Court finds procedurally barred. The Court then addresses, in turn, Daniel's Title VII claims, his FMLA claim, and his common law negligence claim.

### A.   State Statutory Claims

Daniel asserts claims under New York State Human Rights Law ("NYSHRL") and New York City Human Rights Law ("NYCHRL") for race, national origin, and sex discrimination as well as retaliation. *See* SAC p. 1–3. T&M argues that these claims are procedurally barred by the "election of remedies" provisions in the NYSHRL and NYCHRL. T&M Br. 5. Those statutes provide that a person who files a complaint with either the DHR or the New York City

Commission on Human Rights ("Commission") thereby waives his right to sue in court. *See* N.Y. Exec. Law § 297(9) ("Any person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of appropriate jurisdiction . . . *unless* such person had filed a complaint hereunder or with any local commission on human rights." (emphasis added)); N.Y. City Admin. Code § 8-502(a) (similar). Accordingly, courts are required to dismiss suits if the plaintiff previously lodged a complaint with the DHR or the Commission. *See id.* This bar applies in federal as well as state court. *See York v. Ass'n of the Bar of City of N.Y.*, 286 F.3d 122, 127 (2d Cir. 2002); *see also McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 74 n.3 (2d Cir. 2010) ("[A] state law depriving its courts of jurisdiction over a state law claim also operates to divest a federal court of jurisdiction to decide the claim.").

Here, Daniel's complaint to the DHR expressly included claims of race discrimination, national origin discrimination, sexual orientation discrimination, sexual harassment, and retaliation—the same claims Daniel asserts in this lawsuit. *See* Daniel Sur-Reply, Ex. 22, at 17. After reviewing evidence submitted by Daniel and by T&M, the DHR concluded that there was "no probable cause" to believe that any unlawful conduct occurred. *Id.* at 3. "When the [DHR] has issued a finding of no probable cause . . . plaintiff's claims . . . are barred by the [NYSHRL and NYCHRL] election of remedies provisions because [plaintiff] has already litigated the claims before the [DHR]." *Guardino v. Vill. of Scarsdale Police Dep't*, No. 09 Civ. 8599 (CM), 2011 WL 4000999, at *2 (S.D.N.Y. Sept. 6, 2011); *see also, e.g.*, *Desardouin v. City of Rochester*, 708 F.3d 102, 106 (2d Cir. 2013) ("The District Court properly ruled that [plaintiff's] NYSHRL claim was barred on the basis of election of remedies," which "precludes resort to courts after claims have been filed with a local commission on human rights."). Accordingly, the Court must dismiss all of Daniel's claims brought under the NYSHRL and NYCHRL.

### B.     Title VII Hostile Work Environment Claims

#### 1.     Relevant Facts

Daniel alleges that throughout his employment at T&M, he was harassed based on his race, perceived national origin, and perceived sexual orientation.  SAC pp. 23–30.  At his deposition, Daniel testified that this pattern of harassment began during his first week on the job, when Melidones told him that property managers in the "Plaza District," the area around 590 Madison, "prefer to hire white security personnel" and that Melidones believed he was "paying [Daniel] too much."  Daniel Dep. 81, 103.  Between February and September 2011, when Daniel and Melidones worked overlapping shifts, Melidones repeatedly told Daniel "you are not black because you don't wear your pants down your waist; you don't swagger; or you don't what up." *Id.* at 89–90.  Similarly, in July 2011, Melidones told Daniel "smile; you look like a gorilla; why the angry face, smile." *Id.* at 90.  And at some point in 2012, Melidones asked Daniel "are you going to vote for your man, Obama?" *Id.* at 109.

In addition to these comments, Melidones repeatedly watched Daniel nap and change clothes in the locker room. *Id.* at 105.  Daniel believes that Melidones wanted to "keep track" of him because he was a "black male in this building that houses millionaires." *Id.* at 106.  Also, in December 2011, a laptop computer was stolen from a business that rented space at 590 Madison. *Id.* at 106–07.  The video footage showed a black male with a bald head taking the laptop, and Melidones asked Daniel if it was him. *Id.* at 107.

According to Daniel, the final instance of race-based harassment occurred on May 4, 2012.  On that date, Melidones instructed Daniel to go upstairs to Bain Capital and speak with Bain's office manager about an employee who was going to be terminated. *Id.* at 112.  Instead of going upstairs, Daniel called Bain's office manager on the telephone. *Id.* at 113.  Seconds

later, Melidones called Daniel and launched into a "screaming, belligerent, profanity-laced tirade." *Id.* at 114.  In the course of berating Daniel, Melidones called him a "fucking idiot" and "fucking nigger." *Id.* at 114–15.  Daniel later learned that Bain had instructed T&M executives to handle the termination discretely, so no one—including Daniel—should have been told about it. *Id.* at 140.  Daniel therefore inferred that he had been "set up." *Id.* at 143.

Daniel also testified that Melidones harassed him based on his perceived national origin. Although Daniel is from St. Vincent and the Grenadines, an island in the Caribbean, Melidones believed, based on Daniel's accent, that he is from England. *Id.* at 9–10, 91.  Accordingly, Melidones often spoke in an "imitated English accent," asked Daniel if he knew "the meaning of large words," and told Daniel to "go back to England." *Id.* at 91, 92, 109.  When Daniel showed Melidones his birth certificate in an effort to correct Melidones's misperception and bring an end to his harassing behavior, Melidones asked Daniel why he came to "this country" rather than staying in his "own country." *Id.* at 109.  Later, Melidones sang calypso to Daniel at least once. *Id.* at 132.

As to Daniel's perceived sexual orientation, the first offensive comment was made by Joe Greisch, the property manager of 590 Madison. *Id.* at 74.  Soon after Daniel began working there, Greisch "made a reference to the clothes [Daniel] was wearing." *Id.*  Daniel interpreted this comment as related to Greisch's "perception of [Daniel's] sexual orientation." *Id.*  Daniel therefore began entering the building through a back entrance to avoid encountering Greisch. *Id.* In a similar vein, Melidones once came into the locker room while Daniel was changing and said, "I didn't hire you to be beautiful; I want a supervisor, not a God." *Id.* at 234.  Several months later, in March 2012, Melidones simultaneously targeted Daniel's perceived national origin and sexual orientation:  He called Daniel around 6 or 7 p.m., during Daniel's shift, and

13

told him "I am at the Broadway show Mary Poppins. . . .  I can see you as Mary Poppins; you will make a good Mary Poppins."  Daniel Dep. 234.

Daniel also objects to a pattern of crude banter between Melidones and another T&M employee, Manny Padermo.  During a recorded conversation with Daniel, Padermo explained that he "used to goof on [Melidones's] name."  Daniel Sur-Reply, Ex. 10, at 4.  Melidones would respond by calling Padermo "Manny the homo," mocking Padermo's last name.  *Id.*; *see also* Daniel Dep. at 232.  Daniel felt that Melidones was directing the slur at him.  Daniel Sur-Reply, Ex. 10, at 4.  At some point, Melidones also "lean[ed] into [Daniel], into [his] right ear and sa[id], 'homo.'"  Daniel Dep. 232.

On another occasion, Melidones "brushed up against [Daniel's] buttocks" with "his genitalia" and asked Daniel "are you gay?"  *Id.* at 230.  When Melidones "saw how upset [Daniel] was, he tried to appease [Daniel] by saying his son, Anthony Melidones," who later began working at 590 Madison, "is gay."  *Id.*  After that incident, Daniel interpreted Melidones's pattern of watching him nap and change clothes in the locker room as a form of sexual harassment rather than racially motivated harassment.  *See id.* at 231.  Relatedly, when a "gay hotel" opened in Times Square in March 2012, Anthony Melidones asked Daniel if he was going to go.  *Id.* at 249.  The last instance of alleged anti-gay harassment occurred on May 8, 2012. Reacting to the Bain Capital incident that had occurred the previous week, Melidones "slapped [Daniel] physically hard on [his] . . . right shoulder and said to [Daniel], 'man up, be a man.'" *Id.* at 133; *see also id.* at 149.

Melidones categorically denies making these statements.  *See* Melidones Aff. ¶ 9.  Daniel testified that no one witnessed Melidones's harassing comments and behavior towards him, *see* Daniel Dep. at 86, 243, and that none of the discriminatory statements were made in writing or

14

during an audio recording, *see id.* at 115.  Daniel also concedes that, aside from one anonymous phone call in August 2011, he never complained about Melidones's behavior during his tenure at T&M.  *See id.* at 119, 261.  Accordingly, in an attempt to corroborate his testimony, Daniel submitted certified transcripts of recorded phone conversations he had with former co-workers.  Their statements, however, provide limited support for Daniel's account of Melidones's conduct:  Even after being fired from his job at 590 Madison, former T&M security guard Mo Agbaje emphatically stated that Melidones had never used racial or ethnic slurs against him.  Daniel Sur-Reply, Ex. 12, at 4.[2]  Another former T&M employee, Paul Sylvio, stated that Melidones made racial remarks—specifically, jokes about Sylvio's Haitian heritage—about "two times" during his three or four years of employment.  *Id.* Ex. 11, at 2–4.  To be sure, Padermo stated that he agreed with Daniel that Melidones used "racial slurs" and "ethnic jokes" to "belittle people."  *Id.* Ex. 10, at 3–4.  But Padermo's statement is potentially impeachable, insofar as, in the recorded conversation, Padermo insisted that Daniel "cannot use anything [from the conversation] without [his] authorization."  *Id.* at 10.  Whether Padermo would provide the same testimony if under oath is unknown.

For the purpose of resolving T&M's motion for summary judgment, however, the Court assumes that a jury would credit Daniel's testimony about each incident of harassment he experienced and would reject all contrary evidence.  The decisive question is whether, accepting Daniel's account of the facts, a reasonable jury could find in Daniel's favor on his hostile work environment claims.  If so, Daniel has presented a genuine issue of material fact, and the Court must deny T&M's motion for summary judgment on these claims.

---

[2] Daniel also produced an email from Barby Woodward, the manager of a restaurant in 590 Madison, which stated that "[i]f I had witnessed the inappropriate treatment I would definitely testify as such as it would be the right thing to do but I did not."  Daniel Sur-Reply, Ex. 1, at 21.

###### 2.      Applicable Legal Standards

Title VII "prohibits the creation of a hostile work environment" based on race, color,

religion, sex, or national origin.[3]  *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2441 (2013).   The

Second Circuit has described the elements of a hostile work environment as follows:

> To state a claim for a hostile work environment . . . , a plaintiff must plead facts
> that would tend to show that the complained of conduct: (1) "is objectively severe
> or pervasive—that is, . . . creates an environment that a reasonable person would
> find hostile or abusive"; (2) creates an environment "that the plaintiff subjectively
> perceives as hostile or abusive"; and (3) "creates such an environment because of
> the plaintiff's [protected class]."

*Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (quoting *Gregory v. Daly*, 243 F.3d 687, 691–

92 (2d Cir. 2001)).  Importantly, Title VII "does not set forth 'a general civility code for the

American workplace.'"  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)

(quoting *Oncale*, 523 U.S. at 80).  Courts must "filter out complaints attacking 'the ordinary

tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes,

and occasional teasing.'"  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citation

omitted).  To be actionable, "conduct must be extreme to amount to a change in the terms and

conditions of employment."  *Id.*

"[A] work environment's hostility should be assessed based on the 'totality of the

circumstances.'"  *Patane*, 508 F.3d at 113 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23

(1993)).  The Court considers Daniel's allegations "cumulatively in order to obtain a realistic

view of the work environment."  *Aulicino v. N.Y. City Dep't of Homeless Servs.*, 580 F.3d 73, 83

---

[3] The Court construes Daniel's sexual orientation discrimination claims as sexual harassment
claims.  Under Title VII, "workplace harassment that is sexual in content is always actionable,
regardless of the harasser's sex, sexual orientation, or motivations."  *Oncale v. Sundowner
Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998) (approvingly citing *Doe v. Belleville*, 119 F.3d 563
(7th Cir. 1997)).  This includes "male-on-male sexual harassment."  *Id.*

(2d Cir. 2009) (citation omitted).  Factors that may be considered include: "[1] the frequency of the discriminatory conduct; [2] its severity; [3] whether it is physically threatening or humiliating, or a mere offensive utterance; and [4] whether it unreasonably interferes with an employee's work performance."  *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 102 (2d Cir. 2010) (quoting *Harris*, 510 U.S. at 23) (internal quotation marks omitted).

### 3.    Discussion

As a threshold matter, some of the conduct Daniel complains of does not appear to be related to his race, perceived national origin, or sex.  Such incidents "must be removed from consideration."  *Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002).  Even if "they can support an inference that [Daniel] was mistreated, they do not support an inference that this was because of" his membership in a protected class.  *Id.*; *see also Vito v. Bausch & Lomb Inc.*, 403 F. App'x 593, 595 (2d Cir. 2010) (summary order) ("[I]t is axiomatic that in order to establish a . . . hostile work environment . . . a plaintiff must demonstrate that the conduct occurred because of her [membership in a protected class]." (alterations and omissions in original) (citation omitted)).

In particular, the Court discounts Daniel's testimony that Melidones repeatedly watched him nap and change clothes in the locker room.  Daniel speculates that Melidones did so because of his race, *see* Daniel Dep. 105–06, or as a form of sexual harassment, *see id.* at 231.  However, Daniel has provided no evidence (*e.g.*, contemporaneous or even after-the-fact statements by Melidones) to support the inference that Melidones's watching him in this workspace, not an act inherently indicative of hostility or bias, was driven by prohibited animus.  And there is record evidence of a neutral motive that could account for Melidones's presence: ensuring that Daniel, who had issues with lateness, began his shift on time.  *See* Daniel Sur-Reply, Ex. 2, at 34 (text from Melidones to Daniel stating: "The lateness . . . must stop.  I need consistency.  I gave u the

4x12 so u could handle ur personal business during the day."); *id.* at 53 (text from Melidones to Daniel stating: "Please don't be late.").  Likewise, Melidones had an obviously reasonable, non-discriminatory basis for asking Daniel if he had stolen a laptop in December 2011:  The footage from the security camera showed that the thief was a bald black male; Daniel was in the building at the time of the theft and fit that profile.  *See* Daniel Dep. at 107.  Other statements—for instance, asking Daniel to define large words, *id.* at 92, or vaguely commenting on his clothing, *id.* at 74—may well be viewed as obnoxious, but, on this record, they have no apparent link to Daniel's membership in a protected class.  Daniel has not provided any evidence to support an inference that these statements were made because of his race, national origin, or sex, or that employees with different demographic characteristics were not subjected to similarly obnoxious treatment.  To the contrary, Daniel testified that Melidones routinely called "many" T&M employees names such as "buffoons, idiots, useless and incompetent."  *Id.* at 211.

As to the remaining incidents, the Court considers them in the aggregate.  Two modes of analysis are useful.  First, the Court analyzes these incidents with attention to the four factors articulated by the Supreme Court in *Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993).  Second, to assess whether there was a hostile work environment, the Court compares the environment to which Daniel was subjected to those at issue in cases in which Second Circuit and other courts have made such an assessment.

The first factor identified in *Harris* is frequency.  *See* 510 U.S. at 23.  "For racist comments, slurs, and jokes to constitute a hostile work environment, there must be 'more than a few isolated incidents of racial enmity,' meaning that '[i]nstead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments.'"  *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (alteration in original) (citations omitted).  But, as recounted by Daniel,

the incidents ostensibly motivated by his protected characteristics occurred sporadically and relatively infrequently. *See*, *e.g.*, Daniel Dep. 132 (characterizing Melidones's harassment as "random" and, even in May 2012, "unexpected"). The "episodic" incidents Daniel endured were not "sufficiently continuous and concerted in order to be deemed pervasive." *Alfano*, 294 F.3d at 374. *Compare Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004) (finding triable issue as to whether "discriminatory intimidation, ridicule, and insult" was "pervasive" where incidents were "routine" and occurred "almost daily"); *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 70, 75–76 (2d Cir. 2001) (finding a triable issue where a supervisor touched plaintiff in unwelcome manner "constantly," at least on a "daily basis," and frequently engaged in other harassing behavior), *with Rios v. Buffalo & Fort Erie Pub. Bridge Auth.*, 326 F. App'x 612, 614 (2d Cir. 2009) (summary order) (finding no triable issue where plaintiff was exposed to "sexually explicit and ethnically derogatory literature" on an "occasional and episodic" basis); *Negron v. Rexam Inc.*, 104 F. App'x 768, 770 (2d Cir. 2004) (summary order) (finding no triable issue where "on a handful of occasions [plaintiff's] coworker addressed him using a racial epithet, including once over the loudspeaker").

 As to the second *Harris* factor, severity, it is difficult to draw a clear line between conduct that is merely inappropriate and conduct that is sufficiently serious to support a hostile work environment claim. *See Harris*, 510 U.S. at 23. However, it is relevant that the most severe incidents were isolated, whereas Melidones's more frequent behavior toward Daniel was comparatively benign. *See Curtis v. Airborne Freight Corp.*, 87 F. Supp. 2d 234, 247 (S.D.N.Y. 2000) ("As a general rule, hostile work environment claims in the Second Circuit have survived summary judgment in cases where the record reflects either a continuous and repeated pattern of explicit racial slurs or a few particularly severe incidents of discrimination."). For instance,

19

Melidones used a racial slur while yelling at Daniel on one occasion.  Daniel Dep. 115.  That single incident, although reprehensible, cannot, by itself, sustain a hostile work environment claim.  *See Schwapp*, 118 F.3d at 110; *see also Augustin v. Yale Club of N.Y. City*, No. 03 Civ. 1924 (KMK), 2006 WL 2690289, at *22 (S.D.N.Y. Sept. 15, 2006) (collecting cases), *aff'd*, 274 F. App'x 76 (2d Cir. 2008) (summary order).  And the harassing behavior Melidones engaged in multiple times—namely, telling Daniel he is "not black," Daniel Dep. 89–90, and speaking in an imitated English accent, *id.* at 91—are less egregious.  Considering the evidence favoring Daniel cumulatively, "the allegations against [T&M] involve episodes of name-calling, inappropriate behavior by a supervisor, and other perceived slights, which, however regrettable, do not constitute a hostile work environment."  *Augustin*, 274 F. App'x at 77.

As to the third *Harris* factor, Daniel does not claim that Melidones's behavior was threatening or humiliating.  *See Harris*, 510 U.S. at 23.  To the contrary, Daniel testified that Melidones never threatened him, Daniel Dep. 154,[4] and never harassed him in front of others, *id.* at 86, 243.  Accordingly, while summary judgment might be inappropriate if Melidones had physically threatened Daniel or humiliated him in front of his co-workers, *see, e.g.*, *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 21, 23–24 (2d Cir. 2012) (grant of summary judgment for defendant vacated where plaintiffs were insulted in front of co-workers and threatened with physical violence); *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 70–71 (2d Cir. 2000) (grant of summary judgment reversed where at least one racially motivated comment was "physically threatening"); *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 439 (2d Cir. 1999) ("Perhaps no single act can more quickly alter the conditions of

---

[4] Daniel did testify that Melidones threatened to terminate him if he took too many days off, *id.* at 152–54, but that threat is unrelated to Daniel's hostile work environment claim.

employment and create an abusive working environment than the use of an unambiguously racial epithet such as nigger by a supervisor *in the presence of his subordinates*." (emphasis added) (citation omitted)), *abrogated on other grounds by Burlington*, 548 U.S. 53, Daniel's testimony supports the conclusion that the harassment he experienced, although certainly not trivial, was not sufficiently severe to sustain a hostile work environment claim.

The fourth *Harris* factor is whether the alleged harassment interfered with the employee's work performance. *See Harris*, 510 U.S. at 23. The evidence here gives at best limited support for such a finding. Daniel does not allege that Melidones directly undermined him, for instance by subjecting him to "disproportionately burdensome work assignments" or "sabotage." *Raniola v. Bratton*, 243 F.3d 610, 621 (2d Cir. 2001); *see also*, *e.g.*, *Howley v. Town of Stratford*, 217 F.3d 141, 154–56 (2d Cir. 2000) ("diminishing the respect accorded [plaintiff] by subordinates and thereby impairing her ability to lead" contributes to a hostile work environment); *Carrero v. N.Y. City Hous. Auth.*, 890 F.2d 569, 579 (2d Cir. 1989) (denying plaintiff "adequate training" contributes to a hostile work environment because plaintiff is deprived "of a fair and equal opportunity to succeed at her position"). Nor does Daniel claim that Melidones's conduct was so unsettling that he could not successfully complete his job responsibilities.[5] *See Mormol v. Costco Wholesale Corp.*, 364 F.3d 54, 59 (2d Cir. 2004) (finding no triable issue where plaintiff did not claim "that the incidents were physically threatening or humiliating, or that they interfered with her ability to do her job"). And, given Daniel's testimony that he experienced only sporadic harassment, the Court has no other basis on which to infer that Melidones's conduct could have unreasonably interfered with Daniel's work performance.

---

[5] With one exception: Daniel testified that he felt unable to go to work on one occasion—the first workday after Melidones used a racial slur on May 4, 2012—but he returned to work, apparently without issue, the day after that. *See* Daniel Dep. 115–17.

Stepping back from this analysis of discrete factors, it is useful to measure the conduct to which Harris was subjected—essentially that of Melidones—against the conduct at issue in cases in this Circuit in which a hostile work environment has (and has not been) found.  This analysis confirms that Melidones's conduct, viewed in totality, although offensive and inappropriate, did not rise to the level of being sufficiently "severe or pervasive," *Patane*, 508 F.3d at 113, to "amount to a change in the terms and conditions of employment," *Faragher*, 524 U.S. at 788, so as to support a finding of a hostile work environment.

The Second Circuit's decision in *Rivera v. Rochester Genesee Regional Transportation Authority*, 743 F.3d 11 (2d Cir. 2012), is particularly instructive.  There, a plaintiff testified that a co-worker repeatedly called him a "spic" both in and out of his presence and frequently led other co-workers in a chant that referred to plaintiff as a "fat f***" and a "Taco Bell."  *Id.* at 16.  Several co-workers also harassed, bullied, and threatened the plaintiff on a regular basis, including by tampering with his time card and swerving a car at him.  *Id.* at 16–17.  This conduct "interfered with his ability to do his job."  *Id.* at 20.  The Second Circuit found that these facts presented "a close call."  *Id.*  The Circuit ultimately held that the plaintiff had provided "(barely) enough evidence" to survive summary judgment, *id.* at 23, because: (1) plaintiff's co-workers repeatedly used ethnic slurs in a way that created an abusive working environment; (2) plaintiff's testimony was corroborated by other witnesses; and (3) the harassment included "extensive bullying and physical harassment" as opposed to "mere offensive utterance[s]."  *Id.* at 21 (alteration in original) (citation omitted).  The facts here are substantially less stark.  In particular, (1) Daniel testified that Melidones used a racial slur during a single isolated incident, and directed an anti-gay slur at him on one other occasion; (2) Daniel has not offered any corroborating evidence; and (3) apart from the isolated incidents in which Melidones brushed

against Daniel's buttocks and slapped him on the shoulder, Daniel did not testify that he was subjected to threats, assaults, or other physical harassment.  Because Daniel's evidence is far weaker than the evidence presented in *Rivera*, a case the Second Circuit found "a close call," it is not sufficient to survive T&M's motion for summary judgment.

Further confirmation comes from comparing the facts here to the facts of hostile work environment cases in this Circuit in which summary judgment has been granted for defendant employers.  In a number of such cases, the plaintiff employee experienced equally substantial or meaningfully greater harassment than Daniel did.

In *Mendez-Nouel v. Gucci Am., Inc.*, for example, the plaintiff experienced "two instances of touching, . . . workplace banter about a supervisor's sexual orientation and nightlife, and a single occasion where a supervisor told [plaintiff] he was gay but '[y]ou just don't know it.'"  542 F. App'x 12, 13 (2d Cir. 2013) (summary order).  This Court concluded that the episodes plaintiff complained of were "too episodic" and "insufficiently serious" to have materially altered the conditions of plaintiff's employment and therefore granted summary judgment for the employer.  *Mendez-Nouel v. Gucci Am., Inc.*, No. 10 Civ. 3388 (PAE), 2012 WL 5451189, at *11 (S.D.N.Y. Nov. 8, 2012); *see also id.* (collecting cases).  The Second Circuit affirmed, noting that, "[t]aken together, the alleged conduct does not rise to the level of a hostile work environment."  *Mendez-Nouel*, 542 F. App'x at 13.

Similarly, in *Liburd v. Bronx Lebanon Hospital Center*, the District Court granted summary judgment, and the Second Circuit affirmed, where the plaintiff's supervisor:

> (1) ignored and spoke to her harshly at meetings; (2) scolded her for not following the chain of command in seeking consent to attend a conference; (3) threatened transfer to another department; (4) denied transfer to the supervisor of her choice; (5) gave her extra duties . . . ; (6) stripped her of certain duties; (7) referred to her as "black ass" on three occasions; (8) closely monitored her; (9) gave unrealistic time periods to [complete tasks]; (10) eliminated programs . . . that Plaintiff had implemented . . . ;

> (11) declined to rebid for [plaintiff's program]; and (12) ultimately terminated Plaintiff
> and replaced her with . . . a white female.

No. 07 Civ. 11316 (HB), 2009 WL 900739, at *1 (S.D.N.Y. Apr. 3, 2009), *aff'd*, 372 F. App'x 137 (2d Cir. 2010) (summary order).  Viewing the circumstances as a whole, the District Court held that "the evidence merely shows that [plaintiff's supervisor] did not treat her well; it does not, however, rise to the level necessary to make out a hostile work environment claim."  *Id.* at *8.  The Second Circuit agreed that, "notwithstanding the crude and contemptible character of what is alleged," the supervisor's conduct was "not sufficient to raise a genuine issue to be tried as to severity or pervasiveness."  *Liburd*, 372 F. App'x at 140.

Likewise, in *Lewis v. City of Buffalo Police Department*, plaintiff claimed that she was subjected to "inappropriate and hostile comments" on a "daily, or nearly daily" basis.  No. 02 Civ. 0735 (CF), 2007 WL 4191810, at *11 (W.D.N.Y. Nov. 21, 2007), *aff'd*, 311 F. App'x 417 (2d Cir. 2009) (summary order).  As part of this "barrage" of insults, plaintiff's supervisor called her "Queen Bee," meaning "Queen Bitch," and referred to her daughter as "Kizzy," the name of a fictional runaway slave.  *Id.*  The District Court granted summary judgment for the employer, and the Second Circuit affirmed:  The Circuit found that, although plaintiff's supervisor's pattern of referring to plaintiff by "vulgar or derogatory names" was "unprofessional," it was insufficient "to show that her workplace 'was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of her work environment.'"  *Lewis*, 311 F. App'x at 421–22 (quoting *Petrosino v. Bell Atl.*, 385 F.3d 210, 221 (2d Cir. 2004)).

Similarly, in *Figueroa v. City of New York*, the District Court granted summary judgment, and the Second Circuit affirmed, where plaintiff experienced "five potentially inappropriate comments, two pranks, a few acts of mistreatment of her property and threats of violence, and at least ten adverse personnel decisions."  118 F. App'x 524, 525 (2d Cir. 2004)

(summary order).  During some of the most serious incidents of harassment, plaintiff's co-workers threatened to beat her, and one co-worker attempted to hit her with his car.  *Figueroa v. City of New York*, 198 F. Supp. 2d 555, 565 (S.D.N.Y. 2002).  The Circuit held that these "offensive" incidents were "'too few, too separate in time, and too mild . . . to create an abusive working environment.'"  *Figueroa*, 118 F. App'x at 526 (quoting *Alfano*, 294 F.3d at 380) (omission in original).

And in *Fraser v. Fiduciary Trust Co. International*, plaintiff's supervisor called him a "nigger," and his co-workers made various inappropriate remarks about African-Americans, for instance "that African-Americans are lazy and on welfare."  No. 04 Civ. 6958 (PAC), 2009 WL 2601389, at *8 (S.D.N.Y. Aug. 25, 2009), *aff'd*, 396 F. App'x 734 (2d Cir. 2010) (summary order).  The District Court acknowledged that plaintiff's supervisor's remarks "may denote racial hostility" but held that the "offensive utterances . . . fall below the threshold of a Title VII hostile work environment claim."  *Id.*  The Second Circuit affirmed, finding that plaintiff's arguments "lack[ed] merit."  *Fraser*, 396 F. App'x at 735.

In sum, as in these cases, Daniel's testimony indicates that he was mistreated—based in part on his race, perceived national origin, and perceived sexual orientation.  The Court should not be taken as countenancing such "crude and contemptible" conduct.  *See Liburd*, 372 F. App'x at 140.  However, measured against the standards set by the case law, Daniel's mistreatment does not rise to the level of "severe or pervasive" harassment so as to create a "hostile or abusive" work environment.  *Patane*, 508 F.3d at 113.  On his Title VII claim of such an environment, therefore, T&M's motion for summary judgment must be granted.

**B.     Discriminatory Termination**

**1.     Relevant Facts**

In late 2010, Daniel responded to an online advertisement for a fire safety director position with T&M.  Daniel Dep. 46–47.  In December 2010, T&M recruiter Dolan interviewed Daniel and accepted his application.  *Id.* at 46–47.  Dolan then sent Daniel to interview with various T&M clients, including the managers of 590 Madison.  *Id.* at 47–48.

In January 2011, Daniel interviewed with and was hired by Melidones, T&M's security director for 590 Madison, and Wood, the assistant property manager.  *Id.* at 48–52; Daniel Aff. p. 8.  Daniel replaced a white Caucasian male who had been fired because of unprofessional conduct; T&M had received "numerous complaints of him being rude to tenants."  Daniel Dep. 81.  At that time, "the majority of the staff that worked at 590 Madison Avenue were minorities of some kind."  *Id.* at 103.  According to T&M, the staff was comprised of nearly 80 security guards and fire safety directors, of whom about one-third were African-American, and two-thirds were non-white.  Gutstein Aff. ¶ 8; *id.* Ex. C.  In February 2011, Daniel began working at 590 Madison with Melidones as his direct supervisor.  Daniel Dep. 52, 166.

At some point in 2011, Daniel, according to his own testimony, began having problems receiving his personal mail at home.  *Id.* at 183.  He therefore had packages and some other mail delivered to 590 Madison.  *Id.*  On January 25, 2012, after Daniel had received "numerous" packages at his worksite, Daniel received a letter from Capital One.  *Id.*  On the envelope, Melidones had written, "don't fucking make this happen again; this is fucking unacceptable" in red ink.  *Id.* at 183–84.  Daniel asked Melidones about the letter and told him that "going forward, I will not be receiving any personal packages anymore."  *Id.* at 183.  Melidones responded, according to Daniel, that Daniel was not permitted to receive mail at work but could

"continue receiving packages as long as it's not a hundred packages or more." *Id.* at 184. Daniel explained that this distinction was sensible because mail was delivered to the Minskoff offices, while packages were delivered to the lobby or messenger center. *Id.* at 186–87.

Additionally, as recounted above, Daniel claims that Melidones continually harassed him based on his race, perceived national origin, and perceived sexual orientation. *See* pp. 12–15, *supra*. As noted, a particularly serious incident occurred on Friday, May 4, 2012. On that date, Melidones instructed Daniel to go upstairs to the Bain Capital offices and speak with Bain's office manager about an employee who was going to be terminated. Daniel Dep. 112. Instead of physically going to Bain's offices, Daniel called the office manager on the telephone; she sounded "confused" and "perplexed." *Id.* at 113. Seconds later, Melidones called Daniel and launched into a "screaming, belligerent, profanity-laced tirade." *Id.* 114. Daniel later learned that Bain had instructed T&M executives to handle the termination discretely, so no one— including Daniel—should have been told about it. *Id.* at 140. In the course of berating Daniel, Melidones called him a "fucking idiot" and "fucking nigger." *Id.* at 114–15.

On Monday, May 7, 2012, Daniel testified, he felt he "physically could not work at that site anymore" because he "could not face the sight of John [Melidones]." *Id.* at 117. He therefore sent Melidones a text message claiming that he was "sick" with a "head col[d], headache, runny nose, soar [sic] throat." Daniel Sur-Reply, Ex. 2, at 54. After some back-and-forth about who was responsible for finding a replacement, Melidones grudgingly approved Daniel's request to take the day off. *Id.* at 54–58; Daniel Dep. 122.

No other fire safety directors were available that day, so Melidones worked Daniel's shift himself. Melidones Aff. ¶ 18. During the shift, a delivery person attempted to deliver a package for Daniel. *Id.* Because T&M forbids its employees from receiving personal mail or packages at

their worksites,[6] Melidones sent Daniel's package back and commenced an investigation.  *Id.*

¶¶ 18–20.  Melidones spoke with at least five security guards, who all told him that Daniel had

received other packages at 590 Madison.  *Id.* ¶ 20.

Most relevant here, Melidones learned that Daniel had received a package containing a

BB gun while on duty in March 2012 and had shown the gun to other employees at the

worksite.[7]  *Id.*  Consistent with this, Daniel testified that he had ordered a Smith & Wesson M&P

semiautomatic BB pistol with a black finish from Zephyr Sports through Amazon.com; he stated

that he thought that it was a "toy gun."  Daniel Dep. 177–81, 201; *see also* Daniel Aff p. 2;

Daniel Sur-Reply, Ex. 19, at 5.  When the BB gun arrived, Daniel was surprised that it "look[ed]

so realistic."  Daniel Dep. 177.  He showed the BB gun to co-workers Anthony (not supervisor

John) Melidones, Klaudio Tresova, and Edgardo Vias because he believed they might know

where to purchase the necessary pellets and air canister, or how to load and operate the gun.  *Id.*

at 177–78; Daniel Sur-Reply, Ex. 20, at 28–29.

On May 8, 2012, Daniel returned to work and learned about Melidones's investigation.

*See* Daniel Dep. 205.  Based on the information gleaned from his co-workers, Daniel believed

---

[6] The T&M Employee Handbook does not expressly forbid the receipt of personal packages at
worksites, although it does state that "using client equipment for personal use" is "prohibited
behavior that may lead to disciplinary action and/or termination."  Daniel Sur-Reply, Ex. 4, at
12–13.  Regardless, multiple T&M employees affirmed that they had received oral notification
of T&M's policy.  *See* Melidones Aff. ¶ 19.  Daniel contends that that he was unaware of the
policy at the relevant times, but he does not contest its existence.  *See* Daniel Dep. 205.

[7] Daniel testified that he believes that Melidones knew about the BB gun long before May 2012,
*see* Daniel Dep. 184, 205–06, whereas Melidones stated that he learned about the BB gun for the
first time on May 7, 2012, Melidones Aff. ¶ 20.  It is, of course, possible that Daniel's co-
workers told Melidones about the BB gun when it arrived in March 2012.  However, Daniel has
not provided admissible evidence to support that claim.  Because "[a] party may not rely on mere
speculation or conjecture as to the true nature of the facts to overcome a motion for summary
judgment," *Hicks*, 593 F.3d at 166, the Court accepts Melidones's testimony as to this point.

that Melidones was looking for an excuse to fire him. *Id.* at 151–52. At 12:39 a.m. on May 9, 2012, after completing his May 8 shift, Daniel sent Melidones a text message that said:

> I'd like to claim my sick day for yesterday 5/7/12. I understand you're a personal vendetta against me for maybe what transpired on Friday 5/4/12 with Bain Capital and me taking off yesterday due to illness. If this is the case John, please address it with T&M. The use of intimidation, threats, manipulation and lying about an employee causing him/her to resign or be terminated is unwarranted and unprofessional. I will be notifying T&M of your tactics.

*Id.* at 150–51; Daniel Sur-Reply, Ex. 2, at 58–60. At some point on May 8 or 9, 2012, Daniel complained to Greisch, the property manager of 590 Madison, about Melidones's harassing behavior, specifically, that Melidones had slapped him on the back and told him to "man up." Daniel Dep. 149.

During Daniel's shift on May 9, 2012, Melidones served Daniel with a notice of disciplinary action. *Id.* at 207. Melidones told Daniel that he had learned about the package deliveries, including of the "imitation pistol," from checking the security cameras and speaking with Daniel's co-workers. Daniel Sur-Reply, Ex. 7. The notice stated that Daniel "has had several packages delivered to the worksite," including an "imitation pistol. . . . He did open package and showed this item to several other staff members." *Id.* Ex. 22, at 137; Gutstein Aff., Ex. J. The notice also stated that Daniel had been "instructed to stop package deliveries" on April 4, 2012. *Id.* Attached to the notice were five statements written and signed by Daniel's co-workers, who each claimed to have witnessed his receipt of personal packages at the workplace. *Id.* Ex. N. Both Anthony Melidones and Klaudio Tresova affirmed that Daniel had shown them the BB gun at work, and Carmen Negron, who worked in the mailroom, reported that Daniel had informed her that he had received a package containing a BB gun. *Id.* Two other co-workers, Clinton Lisk and Sindia Maldonado, claimed to have seen someone reprimand

Daniel for his package deliveries.  *Id*.  Daniel contends that all of these statements were fabricated.  Daniel Dep. 206.

> Daniel's initial response, written on the back of the disciplinary notice, stated:
>
> This write up has no merit.  It was issued to me vindictively and out of pure spite by security director John Melidones. . . .  I've personally witnessed Mr. Melidones screamed/cursing at guards using profaned languages.  Referring to many of the staffs as buffoons, idiots, useless and incompetents. . . .  The toy gun I'd delivered to me via the building's messenger courier, was showed to his son A.J. and Klaudio (guard) for operational purposes only.  At no point was it displayed to them out of the delivered packaging or out of the box.

Gutstein Aff., Ex. K; Daniel Sur-Reply, Ex. 22, at 138.

At 3:17 a.m. on May 10, 2012, Daniel emailed Wood to complain about Melidones's behavior.  Daniel Sur-Reply, Ex. 1, at 7.  The email requested a meeting "to discuss Mr. John Melidones recent hostile verbal harassment and intimidations" and asserted that the disciplinary write-up was "a form of retaliation."  *Id.*  Daniel claims that Wood never responded to the email; instead, he called Daniel and informed him of the upcoming disciplinary hearing.  *Id.*

On May 15, 2012, T&M held a disciplinary hearing.  Daniel Dep. 215.  The disciplinary committee consisted of John Melidones; Steven Gutstein, T&M's general counsel; John Aleles, the vice president; Carl Capponi, the director of operations; and Toni Scarito, the human resources manager.  *Id.* at 215, 217; Daniel Sur-Reply, Ex. 3, at 6.  Daniel acknowledged that he had numerous personal packages delivered to 590 Madison, including the BB gun.  *See* Daniel Dep. 197, 215–16; Daniel Sur-Reply, Ex. 9, at 2 (list of 15 personal packages delivered to 590 Madison from Amazon.com).  In his defense, Daniel testified, he "attempt[ed] to show the disciplinary committee that Mr. Melidones knew that [he] was receiving packages" and had authorized those deliveries, but he "was not allowed to explain" those facts.  Daniel Dep. 215–16.  Rather, he "was only allowed to explain . . . why [he] was receiving packages."  *Id.* at 216.

After the hearing, the disciplinary committee unanimously recommended that Daniel be terminated because he possessed a BB gun at his worksite and repeatedly received personal packages there.  Gutstein Aff. ¶ 26.  T&M's CEO accepted that recommendation and authorized Daniel's termination.  *Id.*

On May 18, 2015, Scarito notified Daniel via telephone that T&M had decided to terminate him.  Daniel Dep. at 217–18; T&M 56.1 ¶ 67.  She told him that the sole basis for his termination was his receipt of the BB gun.  Daniel Sur-Reply, Ex. 1, at 14.  Similarly, a "separation of service" form completed by Melidones states that Daniel "was having his personal pkgs and mail delivered to the lobby of his worksite" and "accepted delivery of an extremely realistic looking Smith and Wesson BB Gun."  *Id.* Ex. 22, at 192.

Daniel thereafter requested a letter explaining the reason for his termination.  *Id.* at 190.  On May 23, 2012, Gutstein responded that Daniel was "an at-will employee" and was therefore "terminable without cause."  *Id.* at 190–91.  Setting that fact aside, Gutstein explained that Daniel "acknowledged that [he] had a 'bb' gun delivered to [him] at a T&M Client's premises and [he] displayed the 'bb' gun to others at that location."  *Id.* at 190.  This behavior "violated T&M policy," "appears to have violated a provision of the New York Administrative Code" that prohibits possession of air pistols, and "demonstrated egregiously poor judgment."  *Id.*

### 2.    Applicable Legal Standards

Title VII makes it unlawful for an employer "to discharge any individual . . . because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e–2(a)(1).  Discrimination claims brought under Title VII are analyzed under the three-step burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Bucalo v.*

*Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 128 (2d Cir. 2012) (applying the *McDonnell Douglas* burden-shifting framework).

Under the *McDonnell Douglas* test, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. To do so, a plaintiff must show that: (1) he was a member of a protected class; (2) he was qualified for his position; (3) he experienced an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination. *Bucalo*, 691 F.3d at 129. "This burden is not a heavy one." *Gorzynski*, 596 F.3d at 107. However, "'purely conclusory allegations of discrimination' that are devoid of 'concrete particulars' do not suffice to avoid summary judgment." *Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 119 (2d Cir. 2010) (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)).

Where the plaintiff can establish a *prima facie* case, "the burden shifts to the defendant employer to provide a legitimate, non-discriminatory reason for the action." *Raspardo v. Carlone*, 770 F.3d 97, 125 (2d Cir. 2014). "If the employer is able to satisfy that burden, the inquiry then returns to the plaintiff, to demonstrate that the proffered reason is a pretext for discrimination." *United States v. City of New York*, 717 F.3d 72, 102 (2d Cir. 2013). At this stage, "the plaintiff can no longer rely on the *prima facie* case, but may still prevail if []he can show that the employer's determination was in fact the result of discrimination." *Gorzynski*, 596 F.3d at 106. However, "if the record conclusively reveal[s] some other, nondiscriminatory reason for the employer's decision, or if the plaintiff create[s] only a weak issue of fact [as to pretext] and there [i]s abundant and uncontroverted independent evidence that no discrimination ha[s] occurred," then the employer is entitled to summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000); *see also Richardson v. Comm'n on Human Rts.*

& *Opportunities*, 532 F.3d 114, 125–26 (2d Cir. 2008) (concluding that "overwhelming evidence" of legitimate reason for dismissal warranted grant of summary judgment).

### 3.    Discussion

To support his *prima facie* case, Daniel testified that he is a black man from St. Vincent and the Grenadines, Daniel Dep. 9–10; that he was qualified for the fire safety director position, *id.* at 60–61, 272–73; and that he was terminated, *id.* at 216–18.  Daniel has therefore satisfied the first three elements of the *prima facie* case.  *Bucalo*, 691 F.3d at 129.  Accordingly, the first question for the Court to resolve is whether Daniel's termination "occurred under circumstances giving rise to an inference of discrimination."  *Id.*

The evidence on which Daniel relies for this point is the harassing and discriminatory conduct by Melidones, reviewed above.  *See* pp. 12–15, *supra*.  But, significantly, the decision to terminate Daniel was made unanimously by a five-member disciplinary committee comprised of Melidones and four others—Gutstein, T&M's general counsel; Aleles, the vice president; Capponi, the director of operations; and Scarito, the human resources manager—and was then approved by T&M's CEO.  Daniel Dep. at 215, 217; Gutstein Aff. ¶ 26.  Daniel does not allege, let alone provide evidence to support, that Gutstein, Aleles, Capponi, or Scarito discriminated against him or had any motive to do so.  Nor has he provided a basis for imputing Melidones's alleged motivation to the other members of the disciplinary committee.  For example, Melidones did not make any discriminatory statements in front of the other executives, *see* Daniel Dep. 86, 243, and Daniel did not report Melidones's conduct to them, *see id.* at 119, 261.  Accordingly, the evidence about Melidones's behavior does not support an inference that Daniel's termination was discriminatory.  Further, the key facts on which the disciplinary committee relied—Daniel's having ordered and caused a BB gun to arrive at the workplace, and having displayed that gun to

co-workers—are not disputed.  They were established by evidence (including the testimony of

Daniel himself) other than Melidones's testimony.  Any discriminatory motive of Melidones's

thus did not materially infect the disciplinary committee's judgment.

Although the disciplinary committee's independent decision alone warrants granting

summary judgment on this claim, for several reasons the Court separately concludes that, to the

extent Melidones was responsible for the decision to terminate Daniel, Daniel has not provided

sufficient evidence to support a finding that Melidones was motivated by racial animus when he

supported firing Daniel.

First, the "evidence of discrimination is undermined by the 'same actor inference.'  When

the same actor hires a person already within the protected class, and then later fires that same

person, 'it is difficult to impute to [him] an invidious motivation that would be inconsistent with

the decision to hire.'"  *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 137 (2d Cir. 2000) (quoting

*Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997)).  Daniel acknowledges that

Melidones, along with Wood, hired him in January 2011.  Daniel Dep. 48–52; Daniel Aff. p. 8.

After interviewing Daniel in person, Melidones was undoubtedly aware that Daniel is black and

speaks with an accent.  It is therefore difficult to infer that Melidones later fired Daniel because

of his race, perceived national origin, or sex.  *See Ruane v. Cont'l Cas. Co.*, No. 96 Civ. 7153

(LBS), 1998 WL 292103, at *8 (S.D.N.Y. June 3, 1998) ("[I]t is suspect to claim that the same

manager who hired a person in the protected class would suddenly develop an aversion to

members of that class.").  And although the same-actor inference "is less compelling when a

significant period of time elapses between the hiring and firing," the 16-month period from

January 2011 to May 2012 is still "a relatively short time."  *Carlton*, 202 F.3d at 137–38; *see*

*also id.* (favorably citing cases holding that the same actor inference applies to intervals of less

than two years); *Dellaporte v. City Univ. of N.Y.*, 998 F. Supp. 2d 214, 227 (S.D.N.Y. 2014)

(finding same-actor inference "particularly strong" where the same persons hired plaintiff and

then "fired him less than two years later"); *Altman v. New Rochelle Pub. Sch. Dist.*, No. 13 Civ.

3253 (NSR), 2014 WL 2809134, at *13 (S.D.N.Y. June 19, 2014) (similar).

Second, Daniel's testimony belies his claim that he was singled out for discriminatory

treatment.  Daniel testified that "John mistreated everyone," Daniel Dep. 98, 156, for instance,

by "referring to many of the staff as buffoons, idiots, useless and incompetent," *id.* at 211.  And,

Daniel testified, Melidones improperly terminated his predecessor, who was white.  *See id.* at 81,

245.  Accordingly, although Daniel's testimony supports an inference that Melidones was, at

times, unprofessional or disrespectful to his staff and made racially inappropriate comments, it

does not support an inference that Melidones sought to terminate Daniel because of his race or

national origin.[8]

---

[8] Daniel separately argues that Melidones terminated him in retaliation for the text message
Daniel sent at 12:39 a.m. on May 9, 2012.  In that message, Daniel stated, in relevant part, "I
understand you've a personal vendetta against me . . . .  The use of intimidation, threats,
manipulation and lying about an employee causing him/her to resign is unwarranted and
unprofessional.  I will be notifying T&M of your tactics."  Daniel Sur-Reply, Ex. 2, at 58–60.
To establish a *prima facie* case of retaliation, a plaintiff must show: "(1) that she participated in
an activity protected by Title VII, (2) that her participation was known to her employer, (3) that
her employer thereafter subjected her to a materially adverse employment action, and (4) that
there was a causal connection between the protected activity and the adverse employment
action."  *See Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010).  Daniel's claim of
retaliation founders for the reason discussed above, that the decision to terminate him was
unanimously made by a disciplinary committee, as to whom Daniel claims misconduct only as to
Melidones.  In addition, Daniel cannot establish a *prima facie* case of retaliation under Title VII
because he did not engage in "protected activity"—he complained to Melidones about a
"personal vendetta," "intimidation," and other "unprofessional" behavior, but not about
discriminatory conduct on the basis of a legally protected characteristic.  *See Kirkland v.
Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014) ("To state a *prima facie* case of retaliation
under Title VII, a plaintiff must proffer evidence that he engaged in a protected activity, such as
complaining about race discrimination.").

Even if Daniel had established a *prima facie* case, the next step would be to determine whether T&M has "provided a legitimate, non-discriminatory reason" for Daniel's termination. *Raspardo*, 770 F.3d at 125.  T&M has consistently maintained that Daniel's termination was based on his receipt of personal packages at 590 Madison, in particular of the BB gun.  *See* Gutstein Aff., Ex. J, Daniel Sur-Reply, Ex. 22, at 137 (notice of disciplinary hearing); Gutstein Aff., Ex. B, Daniel Sur-Reply, Ex. 22, at 192 (separation of service form); Daniel Sur-Reply, Ex. 1, at 14 (email from Daniel recounting his termination call from Scarito); Gutstein Aff., Ex. O, Daniel Sur-Reply, Ex. 22, at 190–91 (termination letter); Gutstein Aff. ¶ 26; Melidones Aff. ¶ 24.  And Daniel admits that he received "numerous" personal packages at 590 Madison, that those packages included a Smith & Wesson BB gun that looked like a real pistol, and that he showed the BB gun to multiple co-workers at the worksite.  *See* Daniel Dep. 177–78, 183, 197.

Daniel also acknowledges that his conduct violated at least two provisions of the T&M Employee Handbook, which Daniel testified that he had read and signed.  *Id.* at 168.  First, the "code of conduct" states that "carrying or possessing unauthorized weapons—guns, knives, mace or other weapons" is "prohibited behavior" that "may lead to disciplinary action and/or termination of employment."  Daniel Sur-Reply, Ex. 4, at 12–14.  Second, the "possession of firearms" provision states:

> NO EMPLOYEE IS AUTHORIZED TO BRING A FIREARM ONTO A CLIENT PROPERTY, EXCEPT THOSE ON ARMED ASSIGNMENT, WITHOUT THE EXPRESS WRITTEN PERMISSION OF THE CHAIRMAN OF T&M OR HIS DESIGNEE. VIOLATION OF THIS DIRECTIVE MAY RESULT IN IMMEDIATE TERMINATION.

*Id.* at 15 (emphasis in original).  In addition to violating T&M policy, Daniel's possession in the workplace of the $CO_2$-powered BB gun may have violated the New York City Administrative Code, which prohibits possession of "any air pistol or air rifle or similar instrument."  N.Y. City

Admin. Code § 10-131(b); *see also* Gutstein Aff., Ex. O, Daniel Sur-Reply, Ex. 22, at 190–91

(termination letter stating, in relevant part, that Daniel's conduct "appears to have violated a

provision of the New York Administrative Code").

Further, Daniel himself initially conceded that he had been fired because he received an

unlawful weapon at work:  On May 22, 2012, Daniel wrote to the New York State Attorney

General's Office to complain about Zephyr Sports and Amazon.com's sale of the "illegal" BB

gun that he "thought was a toy."  Daniel Sur-Reply, Ex. 19, at 3.  Daniel explained that "[o]n

March 16, 2012, [he] ordered and had delivered to [his] worksite here in Manhattan a 'BB Gun'

from Amazon.com.  My employer fired me on 5/18/12 *because of this purchase and delivery*."

*Id.* (emphasis added).  As such, the evidence that T&M terminated Daniel for a legitimate, non-

discriminatory reason—his possession and display of the BB gun—is compelling.  It is not offset

by non-speculative evidence of an alternative motivation.

The third and final stage in the *McDonnell Douglas* analysis is to consider whether "the

proffered reason is a pretext for discrimination."  *City of New York*, 717 F.3d at 102.  Daniel

asserts that the "real reason" for his termination "was because [he is] a black man who [was]

being paid too much money for the work that [he did]."  Daniel Dep. 144.  Daniel bases this

claim on his testimony that Melidones told him that property managers in the area around 590

Madison "prefer to hire white security personnel" and that Melidones believed he was "paying

[Daniel] too much."  *Id.* at 81, 103.  As noted, however, statements made solely by Melidones do

not support an inference that the five-member disciplinary committee had invidious motivations.

Further, according to Daniel, Melidones made this statement in February 2011, 15 months before

Daniel was fired.  *Id.*  The connection between Melidones's statement and Daniel's termination

is too attenuated to support an inference of discrimination or to overcome the legitimate, non-

discriminatory reason T&M provided for Daniel's termination.  *Cf. Self v. Dep't of Educ. of the City of N.Y.*, 844 F. Supp. 2d 428, 437 (S.D.N.Y. 2012) ("[E]ven assuming [plaintiff's supervisor] uttered these words, they are too attenuated in time from the decision to discipline [plaintiff] to conclude that the disciplinary charges were a pretext.").[9]

Daniel also argues that he was not aware of T&M's policy forbidding receipt of personal packages at the worksite, Daniel Dep. 205, that Melidones authorized his receipt of packages at 590 Madison, *id.* at 183–85, and that he believed that the BB gun he ordered online was a toy, not a firearm or unlawful weapon, *id.* at 177–81, 201.  These arguments could support a conclusion that T&M's decision to terminate Daniel was unfair.  But an unfair decision is not necessarily an illegal one.  Because Daniel was an at-will employee, T&M had the right to terminate him for any reason, or for no reason at all, as long as the decision-makers were not motivated by discriminatory animus.  *See Guilbert v. Gardner*, 480 F.3d 140, 151 (2d Cir. 2007) ("[A]n at-will employment relationship can be terminated by either party for any reason or without reason.").  Daniel's lack of awareness of the relevant policies does not support an inference that the five members of the disciplinary committee were secretly motivated by racism, xenophobia, or sexism.

**D.   Denial of Medical Leave**

In addition to his state and federal law discrimination claims, Daniel claims he was denied medical leave in violation of the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601

---

[9] Daniel also claims that Melidones, who is white, routinely carried a firearm on his person at the worksite and was not disciplined or terminated.  Daniel Aff. p. 2.  This allegation, if true, could support an inference of disparate treatment, if Melidones was not authorized to do so.  However, T&M responds that Melidones *was* authorized to carry a firearm at 590 Madison, *see id.* Ex. A, at 10, and Daniel has not provided evidence to the contrary.

*et seq.  See* SAC pp. 30–32.  This claim is premised on Daniel's own need for medical leave as well as his need to attend to his ill father.

### 1.    Relevant Facts

Daniel testified that on "numerous occasions" he was sick and needed medical attention. Daniel Dep. 221; *see also* Daniel Sur-Reply, Ex. 16 (medical records).  In February 2011, shortly after Daniel began working at T&M, he developed an abscess in his right leg and was hospitalized for three days.  Daniel Dep. 220, 288; *see also* Daniel Sur-Reply, Ex. 16, at 1–2. Later on, between July 2011 and December 2011, he became ill from a "foul odor" emitted from the ventilation system at 590 Madison.  Daniel Dep. 221.  In December 2011, the building engineers discovered a ruptured sewer pipe and resolved the problem.  *Id.* at 223.  Also in December 2011, Daniel discovered that he needed a root canal.  *Id.*; *see also* Daniel Sur-Reply, Ex. 16, at 10–15.  Because Melidones had "previously made threats" to fire Daniel if he "were to take a day off work," Daniel felt he "could not take a day off work to attend to" his dental crisis. Daniel Dep. 222; *see also* Daniel Sur-Reply, Ex. 16, at 11.

Daniel also testified that his father suffers from renal failure and heart complications.  *Id.* at 228.  In November and December 2011, Daniel requested some days off to care for his father, but his request was denied.  *Id.*; *see also* Daniel Sur-Reply, Ex. 16, at 18 (photograph of Daniel's father in the hospital on November 21, 2011).

T&M policy requires that requests for FMLA leave be made in writing at least 30 days in advance.  Melidones Aff. ¶ 6.  Daniel testified that he did not request leave in writing; rather, he made the requests to Melidones verbally.  Daniel Dep. 228–29.  Melidones, for his part, disputes this claim.  In an affirmation, he stated that he has no recollection of Daniel's ever requesting medical leave and has no knowledge of any medical conditions of Daniel's.  Melidones Aff. ¶ 7.

Melidones recalls granting Daniel's requests for occasional days off.  *Id.* ¶ 8.  For the purpose of resolving T&M's motion for summary judgment, the Court accepts Daniel's testimony as to the relevant facts.

### 2.      Applicable Legal Standards

The FMLA entitles covered employees to take up to 12 weeks of leave per year to care for the employee's own "serious health condition that makes the employee unable to perform the functions of [his] position" or to care for a parent, spouse, or child who "has a serious health condition."  29 U.S.C. § 2612.  An "eligible employee" is one "who has been employed for at least 12 months by the employer."  *Id.* § 2611(2)(A).  "The term 'serious health condition' means an illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider."  *Id.* § 2611(11)(A)(B).

To make out a *prima facie* case under the FMLA, a plaintiff must establish five elements: "'(1) that she is an eligible employee under the FMLA; (2) that defendants constitute an employer under the FMLA; (3) that she was entitled to leave under the FMLA; (4) that she gave notice to defendants of her intention to take leave; and (5) that defendants denied her benefits to which she was entitled by the FMLA.'"  *Kim v. Goldberg, Weprin, Finkel Goldstein, LLP*, 862 F. Supp. 2d 311, 317 (S.D.N.Y. 2012) (quoting *Roberts v. Ground Handling, Inc.*, 499 F. Supp. 2d 340, 351 (S.D.N.Y. 2007)).

### 3.      Discussion

Daniel's claims stumble on the first element of the *prima facie* case, namely, whether he was eligible for FMLA leave when he requested time off work.  As noted, Daniel became eligible for FMLA leave only after he had "been employed for at least 12 months."  29 U.S.C.

§ 211(2)(A).  Daniel testified that he interviewed at 590 Madison during the week of January 17, 2011 and was hired some time the following week.  Daniel Dep. 47–52; Daniel Aff. p. 8.  He therefore became eligible for FMLA leave in late January 2012.  Accordingly, Daniel's requests for leave in February 2011 or December 2011, whether granted or denied, are not actionable because they occurred before the 12-month mark.  Daniel does not make any FMLA claim based on denial of leave that occurred after the 12-month mark.

Separately, Daniel's testimony as to the fourth and fifth elements—whether he requested and was denied medical leave—is unclear.  At first, Daniel asserted that he "was not allowed to take days off to attend to my illness" and that this occurred on "numerous occasions."  Daniel Dep. 220–21.  When pressed to identify a specific instance on which he had requested medical leave, however, Daniel provided only three concrete examples: (1) in February 2011, when he was hospitalized for an abscess in his leg and did not come to work for three days, *id.* at 220, 226; (2) when he needed a root canal in December 2011, before he became eligible for FMLA leave; and (3) on May 7, 2012, when Daniel felt ill because of his altercation with Melidones the previous week, *id.* at 225, and when Melidones ultimately granted his request for the day off, *id.* at 122; Daniel Sur-Reply, Ex. 2, at 52–54.  Daniel then testified as follows:

> Daniel:  [K]nowing John's stance on me taking off based on that prior email that I read earlier here in record in which Mr. Melidones said to me I have already taken off more days combined than any other FSDs . . . , I was not going to jeopardize my job by requesting to John to take a day off.
>
> Cavallaro:  I understand.  So your testimony is you did not request time off and were not denied requests of time off because you were afraid to ask?
>
> Daniel:  I could not.  I could not, yes.
>
> . . .
>
> Cavallaro:  After December 2011, was there any point in time that you requested time off for medical reasons?

Daniel:  I could not request because I knew what the response was and so the answer
is no.

Daniel Dep. 224, 227–28.  But the FMLA requires employees to ask their employers for medical

leave.  *See Kim*, 862 F. Supp. 2d at 317.  Daniel "could not simply assume that [his] request

would be denied and so decline to ask."  *Pellegrino v. County of Orange*, 313 F. Supp. 2d 303,

319 (S.D.N.Y. 2004).  Daniel's FMLA claim therefore must be denied.

**D.**      **Negligence**

**1.**      **Relevant Facts**

Daniel alleges that T&M acted negligently by failing to address complaints about

Melidones's harassing and discriminatory conduct.  SAC p. 32.  Because of T&M's refusal to

discipline, transfer, or terminate Melidones, Daniel experienced "immense emotional, physical,

and psychological suffering, distress, and/or anguish."  *Id.*  Daniel also suffers from depression,

severe panic attacks, fatigue, chest pain, headaches, muscle weakness, high blood pressure, sleep

apnea, insomnia, and intensified nicotine addiction as a result of to the abuse he endured while

employed at T&M.  *Id.* at 33.

Daniel also alleges that T&M's counsel was negligent during this litigation.  At 12:03

a.m. on September 24, 2013, Daniel emailed attorneys Meredith Cavallaro and Alicia Valenti

stating, among other things, that his "anti-depressant medication must not be effective" because

he felt that the "only means of escaping this emotional, financial and psychological pain and

suffering (turmoil) is to kill [him]self."  Daniel Sur-Reply, Ex. 16, at 16.  In response, T&M's

counsel urged Daniel "to call 1-800-SUICIDE or 1-800-273-TALK, which are free hotlines that

may be able to further assist you."  *Id.*  They also notified the NYPD of Daniel's suicidal threats.

Daniel Aff., Ex. A, at 13.  At 11:15 a.m. on September 24, 2013, more than 15 NYPD officers

and EMTs arrived at the apartment where Daniel then lived with his father and stepmother,

questioned Daniel and his father, and took Daniel to a psychiatric emergency room.  SAC p. 34.

This incident enraged Daniel's father, who thereafter threw Daniel out of the apartment.  *Id.* at

34–35.

### 2.     Applicable Legal Standards

Under New York law, "a plaintiff must establish three elements to prevail on a

negligence claim: '(1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of

this duty; and (3) injury to the plaintiff as a result thereof.'"  *Alfaro v. Wal–Mart Stores, Inc.*, 210

F.3d 111, 114 (2d Cir. 2000) (quoting *Akins v. Glens Falls City Sch. Dist.*, 53 N.Y.2d 325, 333

(1981).  Breach occurs when an individual fails to exercise "reasonable care under the

circumstances" and in light of the foreseeable risks.  *Philip v. Deutsche Bank Nat. Trust Co.*, No.

11 Civ. 8960 (PGG), 2014 WL 4953572, at *5 (S.D.N.Y. Sept. 30, 2014) (quoting *Scurti v. City*

*of New York*, 40 N.Y.2d 433, 437 (1976)).

### 3.     Discussion

As the Court explained in its January 16, 2014 Opinion resolving Minskoff's motion to

dismiss, allegations of employment discrimination cannot be transmuted into tort claims

sounding in negligence.  Daniel's negligence claim is essentially that T&M failed to protect him

from Melidones's discriminatory harassment.  SAC pp. 32–33.  But this is no different from his

employment discrimination claims under Title VII, the NYSHRL, and the NYCHRL.  And "the

alleged violations of federal, state, and city anti-discrimination laws are not torts under New

York law."  *Baguer v. Spanish Broad. Sys., Inc.*, No. 04 Civ. 8393 (KMK), 2007 WL 2780390,

at *4 (S.D.N.Y. Sept. 20, 2007); *see also, e.g.*, *Treanor v. Metro. Transp. Auth.*, 414 F. Supp. 2d

297, 303 (S.D.N.Y. 2005) ("New York cases reason[] that a discrimination claim is not a tort

because it is 'a new statutory cause of action which was not cognizable at common law.'"
(quoting *Picciano v. Nassau Cnty. Civil Serv. Comm'n*, 736 N.Y.S. 2d 55, 60 (2d Dep't 2001))).

Daniel's claim against T&M's counsel is also unavailing.  His allegations indicate that
Cavallaro and Valenti responded to his alarming threats of self-harm as any reasonable person
would—by urging Daniel to seek help and by alerting the authorities.  Further, the regrettable
aftermath of the NYPD's visit to Daniel's apartment was not foreseeable to someone in opposing
counsel's position.  Accordingly, although the psychological and physical distress Daniel has
experienced as a result of his employment and this litigation is understandable, the SAC does not
thereby state an actionable claim for negligence.

## CONCLUSION

For the foregoing reasons, T&M's motion for summary judgment is granted.  The Clerk
of Court is respectfully directed to terminate the motion pending at docket number 65, and to
close this case.


SO ORDERED.

Paul A. Engelmayer
United States District Judge


Dated: February 19, 2015
         New York, New York