UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
:
OTIS A. DANIEL,
                          Plaintiff,
:
:
:              13 Civ. 4384 (PAE)
         -v-                   :
:             __OPINION & ORDER__
T&M PROTECTION RESOURCES LLC,   :
:
                        Defendant.   :
:
------------------------------------------------------------------ X

PAUL A. ENGELMAYER, District Judge:

    This decision sets out the Court's findings of fact and conclusions of law pursuant to

Federal Rule of Civil Procedure 52 following a four-day bench trial on plaintiff Otis Daniel's

claim that he was subjected to a hostile work environment by his employer, T&M Protection

Resources LLC ("T&M"), in violation of Title VII. Daniel claims that such an environment

arose as a result of harassment directed at him by his supervisor, John Melidones, on account of

Daniel's race, sexual orientation, and national origin.

    The Court heard live testimony from Daniel; Melidones, who supervised Daniel at his

worksite, 590 Madison Avenue; three of Daniel's co-workers, Jonathan John, Roy Johnson, and

Ronald James; John Aleles, the vice president of administration for T&M; Joseph Greisch, the

property manager for 590 Madison and an employee of the building's owner, Edward J.

Minskoff Equities; and Toni Scarito, T&M's Human Resources manager. The Court also

received into evidence various plaintiff's exhibits ("PX") and defendant's exhibits ("DX").

    The findings of fact that follow are based on the Court's review of the entire trial record.

Where based in whole or part on a witness's testimony, the Court's findings reflect credibility

determinations based on the Court's assessment of, *inter alia*, the relevant witness or witnesses'

experience, knowledge, and demeanor and the believability of his or her testimony in light of the other evidence in the case.

## 'I.    Factual Background

The Court first sets out the background facts to this dispute. Except as otherwise noted, these facts are not in dispute.

### A.    Daniel's Hiring and Job Responsibilities

Daniel is a 37-year-old Black man from St. Vincent and the Grenadines, a small island nation in the Caribbean. He moved to the United States in 1994 at age 13. Daniel identifies as gay, although he did not disclose his sexual orientation to his supervisors or coworkers at T&M. Daniel has worked as a security guard since 2005.

In late 2010, Daniel responded to an online advertisement for a fire safety director position with T&M, a global security and investigations firm based in New York City. Tom Dolan, a T&M recruiter, interviewed Daniel and accepted his application. To obtain a site assignment for Daniel, Dolan sent him to interview with various T&M clients, including the managers of the UBS Building on Sixth Avenue and the IBM Building—590 Madison Avenue.

At 590 Madison, Daniel interviewed with Melidones, the security director, and Bill Wood, the assistant property manager. About a week later, Dolan informed Daniel that he had gotten the job. In February 2011, Daniel began working at 590 Madison as an at-will employee. Melidones was his direct supervisor. Daniel initially worked the day shift, from 8 a.m. to 4 p.m. Throughout Daniel's employment, Melidones also worked during the day, from 7 a.m. to 3 p.m.

In September 2011, Daniel transferred to the night shift and began working from 4 p.m. to 12 a.m. Because Melidones continued to work from 7 a.m. to 3 p.m., during the remainder of

his employment, Daniel saw Melidones in person less frequently and, in general, for shorter periods of time.

Throughout, Daniel's post at 590 Madison remained constant: He was stationed at a security guard podium in the rear lobby of the building, from which point he faced out into the rear lobby and a semi-public atrium beyond. A few feet behind Daniel was a wall, and behind that, the elevators.

**B.    May 2012**

A number of the most significant, and sharply contested, events at issue occurred during a two-week period in May 2012 that culminated in Daniel's termination.

On Friday, May 4, 2012, at around 5 p.m., Daniel, standing at his post, received a call from Melidones, who instructed him that an important tenant, Bain Capital, would be terminating an employee's employment and would need a security guard present. Melidones instructed Daniel to go to Bain's offices on the 42nd floor to meet a particular Bain official.

Daniel, however, instead of going to the 42nd floor, called up to the Bain Capital offices and spoke with a Bain employee other than the one whose name he had been given. Very soon after, Daniel received another call from Melidones. Melidones had received a call from Greisch, the 590 Madison building manager. Greisch was angry that Daniel's seemingly simple task had been mishandled. He reported that Daniel's call had (according to Bain) alerted others at Bain to the forthcoming termination, causing a situation at Bain and leading Bain to excoriate Greisch. On this second call, Melidones was irate. As discussed below, the language Melidones used on this call—in particular, whether Melidones called Daniel a "fucking nigger"—is a central area of dispute.

On May 7, 2012, the following Monday, Daniel texted Melidones to tell him that he was sick and unable to work. *See* PX 9. Daniel did not work on May 7. Melidones covered his shift. While covering for Daniel, Melidones was approached by a postal worker who asked Melidones to accept, on Daniel's behalf, a package for Daniel. The postal worker explained that Daniel's practice was to receive packages without those packages going to the mailroom. Melidones refused to accept the package. Melidones then inquired among the 590 Madison staff as to whether Daniel had previously received packages directly from the USPS. He learned that Daniel had been receiving packages on a weekly basis. Of particular salience, Melidones learned that, at an earlier date—which the evidence demonstrates was in March 2012—Daniel had received a package at 590 Madison that contained a BB gun that looked like a real gun. Daniel had then overtly displayed that BB gun to his colleagues in the rear lobby.

Daniel returned to work on Tuesday, May 8. While at work that day, Daniel learned from his colleagues that Melidones was angry at him, had refused to accept a package for him, and had inquired about his receipt of packages, including the BB gun. Early in the morning of May 9—*i.e.*, soon after the end of Daniel's shift the night of May 8—Daniel texted Melidones. Daniel wrote,

> I'd like to claim my sick day for yesterday, 05/07/12. I understand you've a personal vendetta against me for maybe what transpired on Friday, 05/04/12 with Bain Capt. and me taking off yesterday due to illness. If this is the case John, please address it with T&M. The use of intimidation, threats, manipulation, and lying about an employee to cause[] him or her to resign or be terminated is unwarranted and unprofessional. I will be notifying T&M of your tactics.

*See* PX 9. Melidones did not respond.

When Daniel arrived for his shift on the afternoon of May 9, he was told by a colleague, Jonathan John, that Melidones wanted to speak with him at the loading dock. Daniel used his cellphone to surreptitiously record the audio of that meeting. *See* PX 4 (audio recording); PX 5

(transcript).[1] The recording reflects that the brief meeting was heated. Melidones was at points enraged, faulting Daniel for his handling of the Bain incident, for his package deliveries to 590 Madison, and primarily for the early-hours text to Melidones, which Melidones cast as a threat. Daniel's attempts to parry were repeatedly interrupted by the angry Melidones. At the meeting, Melidones presented to Daniel a disciplinary notice. *See* PX 13. That notice detailed Daniel's alleged infractions, including that he had had "several packages delivered to [the] worksite," that he had been "instructed to stop these deliveries," and that one such delivery included "an 'imitation pistol.'" Melidones directed Daniel to sign the form and leave it on Melidones's desk. He also instructed Daniel that Daniel could write a response to the allegations on the back of the form.

That evening, Daniel wrote his "rebuttal" on the back of the form, made a copy, and faxed a copy to Wood.

## C. Disciplinary Hearing

On Monday, May 14, 2012, Melidones texted Daniel instructing him not to come to work and, instead, to contact Carl Capponi, vice president of operations at T&M. *See* PX 9.

On May 15, 2012, Daniel attended a disciplinary hearing at T&M's corporate offices at 230 Park Avenue. At that meeting were Melidones; Scarito, T&M's Human Resources manager; Capponi, Aleles, T&M's vice president of administration; and Steven Gutstein, T&M's in-house counsel. At that meeting Daniel attempted to defend himself against the charge that he had been receiving packages at 590 Madison against T&M policy. Daniel also played for the T&M executives the recording he had made from the May 9 confrontation in the loading dock. While

---

[1] The Court admitted PX 4 as substantive evidence. The transcript at PX 5 was received solely as an aid in understanding the sometimes elusive words used in the Daniel-Melidones meeting.

the recording played, Daniel stepped out of the room. After it was over, he returned to the conference room. As discussed more fully below, the parties dispute the extent, if any, to which Daniel attempted at the meeting to voice complaints of Melidones's harassment, and whether he was prohibited from doing so.

On May 16, 2012, Daniel returned to T&M's offices to deliver a copy of the recording of the May 9 confrontation.

On May 18, 2012, T&M terminated Daniel's employment.

**D.      EEOC and DHR**

On September 1, 2012, Daniel filed a complaint with the Equal Employment Opportunity Commission ("EEOC"). He asserted claims of discrimination based on race, national origin, sex, and sexual orientation as well as a claim of retaliation. *Id.* Because his sexual orientation claims were (then) cognizable under state but not federal law, the EEOC referred him to the New York State Division of Human Rights ("DHR").

On September 5, 2012, Daniel filed a complaint with the DHR. He asserted claims of discrimination based on race, national origin, and sexual orientation as well as claims of retaliation and sexual harassment. T&M responded that Daniel had been terminated due to his unauthorized package deliveries and possession of a weapon, the BB gun. Based on documentary submissions from Daniel and T&M, DHR concluded that Melidones's statements "may rise to a certain level of insensitivity but not to an actionable degree under discrimination law" and found that T&M had articulated "legitimate and nondiscriminatory business reasons" for Daniel's termination that were neither "pretextual nor otherwise unworthy of credence." On March 4, 2013, the agency therefore issued a determination of "no probable cause" for the

allegations in Daniel's complaint. The DHR's order notified Daniel that he could appeal the agency's decision to the New York Supreme Court within 60 days.

On April 18, 2013, the EEOC adopted the DHR's findings and closed its file on Daniel's complaint. It also issued a "Right to Sue" letter, notifying Daniel that he could file suit in federal or state court within 90 days.

## II.    Procedural History

### A.    Daniel's Complaints and the Initial Stages of This Litigation

On June 24, 2013, Daniel filed the original complaint in this action. Dkt. 2. He named both T&M and Edward J. Minskoff Equities ("Minskoff"), the company that manages the 590 Madison property, as defendants. *Id.* On August 19, 2013, Daniel filed an Amended Complaint. Dkt. 11. On September 25, 2013, Minskoff moved to dismiss the Amended Complaint. Dkts. 24–26. On October 7, 2013, Daniel filed his second amended complaint (the "SAC"). Dkt. 31.

On October 28, 2013, Minskoff moved to dismiss the SAC. Dkts. 33–34. On January 15, 2014, after briefing, the Court granted Minskoff's motion as to Daniel's negligence claim but denied it as to all other claims. Dkt. 43, *reported at Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302 (S.D.N.Y. 2014). The Court held, *inter alia*, that the SAC contained sufficient factual allegations to support a plausible inference that Minskoff and T&M jointly employed Daniel and that Melidones was an agent of both companies, such that Minskoff could be held liable for Melidones's allegedly discriminatory conduct. *Id.* at 19, 21. As to Daniel's negligence claim, however, the Court noted that "allegations of employment discrimination cannot be transmuted into tort claims sounding in negligence." *Id.* at 22. The Court therefore dismissed the negligence claim, while preserving Daniel's federal and state employment discrimination claims.

On January 29, 2014, the Court granted Daniel's application for pro bono counsel and directed the Office of Pro Se Litigation to seek limited discovery counsel for him. Dkt. 44. On February 11 and March 10, 2014, two attorneys filed notices of appearance indicating that they would serve as pro bono counsel for Daniel. Dkts. 45, 50. In late April 2014, however, Daniel directed his counsel to withdraw and informed the Court that he had decided to proceed *pro se*. *See* Dkts. 53–54, 56. On May 2, 2014, the Court authorized pro bono counsel's withdrawal. Dkt. 57.

On May 9, 2014, Daniel and Minskoff submitted a stipulation of dismissal. Dkt. 61. On May 12, 2014, the Court so-ordered the stipulation, leaving remaining Daniel's claims against T&M only. Dkt. 62.

Several months later, on November 13, 2014, Daniel sought to vacate the stipulation of dismissal. Dkt. 100. Daniel argued that he had been "misled into believing that [Minskoff] as a matter of law could not be held fully liable for any of [his] claims alleged because [Minskoff] was not [his] or [his supervisor's] direct employer" and that he "did not understand the meaning of dismissal with 'prejudice.'" *Id.* at 1. In response, counsel for Minskoff produced their email correspondence with Daniel, which unambiguously demonstrated that Minskoff had not behaved improperly in procuring the settlement agreement. *See* Dkts. 102–03. The Court therefore denied Daniel's motion to vacate the stipulation of dismissal with Minskoff. Dkt. 105.

On July 31, 2014, T&M—the sole remaining defendant—moved for summary judgment. Dkts. 65–66. At Daniel's request, the Court approved an expedited briefing schedule. Dkt. 78. On August 4, 2014, Daniel submitted his opposition. Dkt. 75. On August 21, 2014, T&M filed its reply. Dkt. 80. On September 9, 2014, Daniel requested permission to file a sur-reply; the Court granted his motion, Dkt. 91. On September 23, 2014, Daniel filed his sur-reply. Dkt. 93.

On October 23, 2014, T&M filed its second reply in support of its motion for summary judgment. Dkts. 97–98.

## B. The Court's Summary Judgment Decision

On February 19, 2015, in a 44-page opinion, the Court granted summary judgment to T&M on each of Daniel's claims. Dkt. 106, *reported at Daniel v. T & M Prot. Res. LLC*, 87 F. Supp. 3d 621 (S.D.N.Y. 2015). First, the Court held that Daniel's New York State and City claims were procedurally barred by the election of remedies provisions in the NYSHRL and NYCHRL. 87 F. Supp. 3d at 630–31. Second, the Court held that Daniel had not established a claim for hostile work environment. The Court excluded from its analysis several of Daniel's complaints that it found were unrelated to race, sexual orientation, or national origin, including that Melidones had watched Daniel nap and change clothes in the locker room, asked Daniel about a stolen laptop, and asked Daniel to define large words. *See id.* at 634–35. The Court found that Daniel had provided no evidence suggesting those incidents—while "obnoxious"— were linked to Daniel's race, sexual orientation, or national origin. *Id.* at 635.

The Court assessed the remaining incidents "in the aggregate" through two lenses: (1) under the four factors articulated by the Supreme Court in *Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993), and (2) as compared with other cases in this Circuit in which courts have found hostile work environments. *Id.* As to the first *Harris* factor, frequency, the Court held that the incidents of harassment were too episodic. On the second factor, the severity of the harassment, the Court held that the conduct was insufficiently egregious except for the one incident in which Melidones had allegedly used a racial slur. "That single incident, although reprehensible" the Court reasoned, drawing on Circuit authority, "cannot, by itself, sustain a hostile work environment claim." *Id.* at 636. As to the third factor, the threatening or humiliating nature of

the harassment, the Court noted that Daniel did not contend that Melidones's harassment was threatening or humiliating. *Id.* Fourth, as to whether Melidones's harassment interfered with Daniel's work performance, the Court held that the evidence provided "at best limited support for such a finding." *Id.*

The Court then compared Daniel's work environment to others found to be actionably hostile in this Circuit. *See id.* at 637–39. "[M]easured against the standards set by the case law," the Court held, "Daniel's mistreatment does not rise to the level of 'severe or pervasive' harassment so as to create a 'hostile or abusive' work environment." *Id.* at 639.

Next, the Court considered Daniel's claim for discriminatory termination. The Court held that Daniel's claim failed because he had not made out a *prima facie* case of discrimination under the *McDonnell Douglas* burden-shifting framework. Although Daniel had established that he is a member of a protected class, that he was qualified for his position, and that he suffered an adverse employment decision, he had not established that the termination decision occurred under circumstances giving rise to an inference of discrimination. *Id.* at 643. *See generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). That was because, "significantly, the decision to terminate Daniel was made unanimously by a five-member disciplinary committee comprised of Melidones and four others—Gutstein, T&M's general counsel; Aleles, the vice president; Capponi, the director of operations; and Scarito, the human resources manager—and was then approved by T&M's CEO." *Id.* at 643. "Accordingly, the evidence about Melidones's behavior does not support an inference that Daniel's termination was discriminatory. Further, the key facts on which the disciplinary committee relied—Daniel's having ordered and caused a BB gun to arrive at the workplace, and having displayed that gun to co-workers—are not disputed." *Id.*

The Court next addressed Daniel's claim under the Family and Medical Leave Act. The Court held this claim infirm because Daniel's request for medical leave occurred prior to the date—January 2012—after which he became eligible for FMLA leave. *Id.* at 648. Nor was there evidence that Daniel had actually *requested* such leave at all. *Id.*

Finally, the Court rejected Daniel's negligence claim. As the Court explained, "Daniel's negligence claim [was] essentially that T&M failed to protect him from Melidones's discriminatory harassment," which was "no different from his employment discrimination claims under Title VII, the NYSHRL, and the NYCHRL." *Id.* at 649. "And 'the alleged violations of federal, state, and city anti-discrimination laws are not torts under New York law.'" *Id.* (quoting *Baguer v. Spanish Broad. Sys., Inc.,* No. 04 Civ. 8393 (KMK), 2007 WL 2780390, at *4 (S.D.N.Y. Sept. 20, 2007)).

### C. The Second Circuit's Decisions

Daniel appealed the summary judgment decision. The Second Circuit initially dismissed Daniel's appeal as lacking an arguable basis in law or fact. *See* Case No. 15-560, Dkt. 35. Daniel moved for reconsideration of that decision, which the Circuit denied. *See id.*, Dkt 80. The EEOC, appearing as amicus curiae, then moved for clarification of the Circuit's decision denying reconsideration. *See* Dkt. 81. It principally argued that a single use of the word "nigger" could support a hostile work environment claim, and urged the Circuit panel to reinstate that claim. The Circuit panel did so: On June 17, 2016, in response to the EEOC's motion, the court reinstated Daniel's appeal as to the hostile work environment claim only. *Id.*, Dkts. 84, 88. After full merits briefing and argument, the Circuit vacated this Court's decision as to Daniel's

hostile work environment claim and remanded. *Daniel v. T & M Prot. Res., LLC*, 689 F. App'x 1, 2 (2d Cir. 2017).

First, as to the claim of racial harassment, the Circuit disagreed that *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997), on which this Court had relied, compelled the conclusion that a single use of the N-word could not give rise to a hostile work environment. *Schwapp*, the Circuit held, "did not foreclose the possibility that the one-time use of a severe racial slur could, by itself, support a hostile work environment claim when evaluated in the cumulative reality of the work environment." 689 F. App'x at 2. The Circuit noted that it had elsewhere stated, in *dicta*, that "perhaps *no single act* can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates." *Id.* (quoting *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 24 (2d Cir. 2014) (emphasis added)). The Circuit "decline[d] to confront the issue of whether the one-time use of the slur 'nigger' by a supervisor to a subordinate can, by itself, support a claim for a hostile work environment," but nevertheless "conclude[d] that the district court improperly relied on our precedents when it rejected this possibility as a matter of law." *Id.*

Next, the Circuit assessed Daniel's sexual harassment and sexual-orientation harassment claims. It found that this Court had properly considered Daniel's claims as sexual harassment, under *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998), and as a form of sexual-orientation harassment based on Daniel's perceived failure to conform to gender stereotypes. *Id.* at 2.[2]

---

[2] As the Circuit noted, its precedent at the time held that "Title VII does not currently protect against discrimination based on sexual orientation." *Id.* (citing *Zarda v. Altitude Express*, No. 15-3775, 855 F.3d 76, 81-83, 2017 WL 1378932, *3-4 (2d Cir. Apr. 18, 2017)). Rather, under

The Circuit went on to explain, however, that the summary judgment decision had erred by "failing to include in its analysis some of the complained-of facially neutral incidents of harassment" because "a plaintiff may rely upon facially neutral conduct to bolster a harassment claim when 'the same individual engaged in multiple acts of harassment, some overtly [based on a protected characteristic] and some not.'" *Id.* at 3 (quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 547–48 (2d Cir. 2010)). Those incidents included Melidones asking Daniel about a stolen laptop and Melidones watching Daniel nap and change his clothes.

In sum, the Circuit held it was error to hold, as a matter of law, that Daniel's harassment as alleged was insufficiently severe to support a claim under Title VII. As the Circuit explained: "Daniel alleged approximately twenty discrete incidents of harassment during his 15-month employment, and at least two incidents strike this Court as severe (being called a 'nigger' by his supervisor, and his supervisor brushing his genitalia against Daniel's buttocks)." *Id.* The Court

---

then-binding precedent, Title VII only "offer[ed] protection for discrimination because of the plaintiff's failure to conform to gender norms." *Id.* The Circuit, sitting *en banc,* earlier this year revisited this issue, and held that Title VII's protections include discrimination based on sexual orientation. *Zarda v. Altitude Express, Inc.*, 883 F.3d 100, 131 (2d Cir. 2018) (en banc). The Court held:

> As explained above, sexual orientation discrimination is a subset of sex discrimination because sexual orientation is *defined* by one's sex in relation to the sex of those to whom one is attracted, making it impossible for an employer to discriminate on the basis of sexual orientation without taking sex into account. Sexual orientation discrimination is also based on assumptions or stereotypes about how members of a particular gender should be, including to whom they should be attracted. Finally, sexual orientation discrimination is associational discrimination because an adverse employment action that is motivated by the employer's opposition to association between members of particular sexes discriminates against an employee on the basis of sex.

*Id.* In light of that intervening change of law in the midst of this case, the Court has considered Daniel's claim for sexual-orientation discrimination under the standard articulated by the *en banc* court in *Zarda,* rather than under the earlier, more narrow conception of Title VII that permitted claims only where discrimination was based on a failure to conform to gender norms.

added that "the sexual harassment Daniel faced could be perceived as threatening." *Id.* at 4.

And the Court emphasized that, because "'no single factor is required' in order for a hostile work

environment claim to survive summary judgment," the fact that Daniel missed only one day of

work did not bar his claim. *Id.* (quoting *Harris*, 510 U.S. at 23).

Finally, the Court directed this Court to consider the multiple forms of harassment

together. The Court explained that the harassment when "[r]eviewed in the aggregate" could be

found to have altered the conditions of Daniel's employment; it instructed that the "evidence that

Daniel was harassed on multiple fronts—because of his race, sex, and national origin—should

also be considered when evaluating Daniel's work environment as a whole." *Id.* (citing *Cruz v.*

*Coach Stores, Inc.*, 202 F.3d 560, 572 (2d Cir. 2000)).

### III.    Legal Standard on a Hostile Work Environment Claim

To establish a hostile work environment claim, a plaintiff must show (1) that the

workplace was permeated with discriminatory intimidation that was sufficiently severe or

pervasive to alter the conditions of his or her work environment, and (2) that a specific basis

exists for imputing the conduct that created the hostile environment to the employer." *Daniel*,

689 F. App'x at 1–2 (internal citations and quotations omitted). "Isolated incidents usually will

not suffice to establish a hostile work environment, although [the Second Circuit has] often noted

that even a single episode of harassment can establish a hostile work environment if the incident

is sufficiently severe." *Id.*

"The Supreme Court has held that a work environment's hostility should be assessed

based on the 'totality of the circumstances.'" *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007)

(quoting *Harris*, 510 U.S. at 23). "Factors that a court might consider in assessing the totality of

the circumstances include: (1) the frequency of the discriminatory conduct; (2) its severity; (3)

whether it is threatening and humiliating, or a mere offensive utterance; and (4) 'whether it unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Harris*, 510 U.S. at 23).

## IV. Findings of Fact: Disputed Issues

### A. Overview

The Court's task as fact finder in this case is centrally to resolve credibility disputes between Daniel and Melidones. Daniel alleges that Melidones directed several episodes of disquieting harassment towards him. Most of the alleged harassment was verbal, save one instance in which Daniel alleges that Melidones brushed his private parts against Daniel. Melidones denies these claims. For the most part, the incidents that Daniel alleges occurred outside the presence or earshot of others; to the limited extent that other persons were possibly percipient witnesses to these events, no witness at trial corroborated Daniel's claims. And Daniel—despite claiming in a variety of fora about other slights and infractions by Melidones and T&M once his termination loomed in early May 2012—did not report any of these episodes until well after his employment at T&M ended. Further, as developed below, Daniel did not report any of the most serious alleged episodes in his written complaint to DHR. These include the two that the Circuit panel judged as potentially severe—Melidones's having called Daniel a "fucking nigger" on May 4, 2012, and his having deliberately brushed his private parts against Daniel while the two men were in the 590 Madison lobby—and a third which this Court regards also as severe, Melidones's having earlier called Daniel a "gorilla."

An important question for the Court as finder of fact is therefore whether—in the absence of any corroborative evidence, real-time "outcry" witnesses, or reasonably contemporaneous complaints by Daniel—Daniel's claims in this lawsuit of such serious on-the-job misconduct can

be credited. Were the episodes Daniel alleges of the kind that one would ordinarily expect an employee victim to complain of in or close to real time, including after termination? What weight is to be attached to Daniel's silence on these points for many months thereafter, including in fora such as the DHR complaint that provided a natural opportunity to complain? And, to the extent that these considerations counsel hesitation before crediting a complainant's claims, did Daniel's testimony about these events at trial inspire sufficient confidence to merit crediting his present account?

In this section, the Court proceeds, first, by detailing Daniel's present allegations; second, by reviewing the complaints that Daniel made and the fora in which he did so; and, third, setting forth the Court's findings of fact. The Court ultimately finds that, as to the central episodes on which Daniel's claim of harassment turns, Daniel has not carried his burden of proof. The Court cannot find, based on a preponderance of the evidence presented here, that the episodes that—if credited—would most powerfully support a claim for a hostile work environment, occurred as Daniel alleges. The Court does credit, however, Daniel's allegations as to certain statements by Melidones, which, although less egregious in nature, were reasonably viewed as upsetting by Daniel.

## B.     Daniel's Allegations of Harassment

Daniel's allegations span the duration of his tenure at 590 Madison. They relate to his claims of three types of harassment: on the basis of race, national origin, and perceived sexual orientation. The Court catalogues those allegations below.

### 1.     Racial Harassment

In March 2011, Daniel alleges, Melidones first told him that he was "not Black." Melidones said, "You're not Black because you don't [say] 'What's up?' You don't wear your

pants down your waist. You don't swagger." Daniel alleges that Melidones continued to make similar comments throughout the remainder of Daniel's employment.

In July 2011, Daniel alleges, he was at his podium in the rear lobby when Melidones, while walking past Daniel, looked at Daniel and said, "Smile. Why the angry face? Smile. You look like a gorilla." Daniel understood that comment as intended to offend, and Daniel was offended.

In August 2011, Barby Woodard, the general manager of a café located in 590 Madison and an acquaintance of Daniel, walked past Daniel and Melidones. Daniel alleges that Melidones then said, "You know she likes you. She's dating a Black man. She likes her meat dark and big."

In September 2011, Daniel was at his podium in the rear lobby when Melidones approached him. Daniel alleges that Melidones then said to him: "Are you going to vote for your man Obama?" Daniel alleges that he then felt the need to explain to Melidones that he was "not a Democrat" but rather "a registered Republican" and that he "would vote according to my party." To that, Melidones responded, "Oh, yeah? I guess you're right after all." This was the first and only conversation about politics Daniel had with any of his colleagues at 590 Madison.

In December 2011, Daniel was approached by the office manager of a 590 Madison tenant who informed him that a laptop computer had been stolen from the tenant's offices on the 18th floor. Daniel texted Melidones to tell him. The next day, when Daniel arrived for his evening shift, Melidones was still at 590 Madison. Melidones confronted Daniel and allegedly said, "I have a picture of a Black male with a bald head who's said to be the culprit that stole the computer. Did you steal the computer? Because after all, you're a Black male with a bald

head." Daniel understood this question as an accusation: that Daniel was a "criminal" and that the "likes of [him] are criminals."

Finally, Daniel alleges, on May 4, 2012, the most serious incident of racial harassment occurred. Daniel testified that, that day, he was at his post some time after 4 p.m. when Greisch stopped by to tell him an employee at Bain Capital—a 590 Madison tenant—was going to be terminated that evening. Greisch told Daniel to expect a call from Melidones with instructions. Around 5 p.m. Melidones called Daniel at his podium. As Daniel recounts, Melidones instructed Daniel to "go up to the Bain office on the 42nd floor of the building and speak to its office manager, Ms. Lacy Chelis."

Daniel did not go to the 42nd floor, however, because, Daniel testified, the executive vice president of Minskoff, Jeffrey Sussman, was in the rear lobby and Daniel did not feel it would have been appropriate to leave his post. Instead, Daniel called the Bain offices and asked to speak with Chelis. Daniel told Chelis that he was calling about an employee who was to be terminated. But Chelis was confused—"totally perplexed." Chelis "had no idea what [Daniel] was talking about." Their conversation ended. Soon thereafter, Daniel received another call from Melidones, who "was in a tirade." He was "screaming and yelling, 'Who told you to call? Who told you to call? Shut the fuck up, you fucking idiot. Don't say a fucking word. You fucking idiot.'" In response, Daniel was silent. Daniel alleges that Melidones concluded his "tirade" by saying, "You fucking—don't say a fucking word, you fucking idiot, fucking nigger."

## 2.    National Origin Harassment

Throughout the time Daniel worked the day shift—*i.e.*, until September 2011— Melidones would "frequently" come to Daniel's podium and sing "what I can only liken to a calypso that was sang maybe back in the 1930s or '40s by Harry Belafonte, and it goes 'Day-o,

De-e-o.'" That singing, Daniel alleges, was "a mockery of my cultural heritage as a Rastafarian, as a Caribbean person."

Daniel alleges that Melidones further mocked his national origin by repeatedly speaking to him "in an imitated derisive manner by mimicking in English what he thinks is an English accent." In March 2011, in an attempt to disabuse Melidones of the misconception that Daniel was British, Daniel brought his birth certificate to work and showed it to Melidones. *See* PX 6. That document is dated August 1991 and relates back to Daniel's birth in 1980. On the document is a stamp bearing the pictures of Prince Charles and Princess Diana. When Melidones saw that stamp, Daniel alleges, "it was like confirmation to him that I was English." Melidones then persisted in asking Daniel about British politics and culture and repeatedly told him to "go back to England." Although several of Daniel's co-workers spoke with accents, Daniel never heard Melidones mock their accents or speak to them in accented English.

### 3. Sexual Orientation Harassment

Although Daniel is gay, he has treated his sexuality as an intensely private matter, and never discussed his sexuality with any colleagues at 590 Madison.

In July 2011, Daniel alleges that Melidones approached him at his podium, came behind him at the podium, whispered in his ear, "Are you gay?" and "brushed up against my buttocks with what had to have been his penis." Daniel responded, he alleges, by turning away and saying, "What do you think you are doing?"

Over the next few months—July, August, and September 2011—Melidones repeatedly harassed Daniel, he alleges, on the basis of his sexual orientation. "Almost every day," Melidones would stand next to Daniel's podium, Daniel alleges, and mock the name of Daniel's

co-worker, Manny Perdomo. Melidones would call Perdomo "Manny the homo." Melidones would also whisper the word "homo" to Daniel.

Daniel alleges that Melidones also repeatedly observed Daniel in the locker room at 590 Madison. During his lunch break, Daniel would often go to the locker room to lie down on a bench. During these rests, Melidones would often come to the locker room to watch Daniel, he alleges. Daniel also alleges that Melidones frequently observed Daniel changing his clothes.[3]

In March 2012, Daniel testified, he received a call at his podium at 590 Madison from Melidones. Daniel recounts that the "sole reason" for Melidones's call was to tell Daniel "that he was at a Broadway show called Mary Poppins." As Daniel recalls, Melidones then said, "You'd make a good Mary Poppins. I can see you as Mary Poppins. You'll make a good Mary Poppins."

On May 8, 2012, Daniel's first day back at work following the May 4 incident, Melidones passed by Daniel's podium, he alleges, slapped Daniel on the shoulder, and said, "Man up. Be a man." Melidones had repeatedly told Daniel to "man up" or "be a man." Those comments, Daniel testified, made him "self-conscious of [his] level of masculinity." "How was I not manly enough? What is it about me that makes me less of a man? You know, again, not only was he saying that to me because—maybe because as a Black man I don't portray that hyper-masculine, you know, toughness that stereotypically one expects an African American or

---

[3] Daniel described Melidones's locker-room observations as the racially motivated surveillance of a distrustful boss. The incident could also be viewed as supporting a claim of sexual-orientation harassment. The Court was prepared to consider this incident, if factually established, for both purposes, and as noted, below, the Court has also considered all established incidents of alleged harassment in the aggregate. But the Court ultimately did not credit Daniel's testimony to the effect that Melidones specifically eyed him in the 590 Madison locker room.

Black American male to behave, but he also—because of his perception of me being gay, I am somehow less of a man."

## C.     Pre-Litigation Complaints

The Court finds that Daniel did not make any complaints in real time about the most significant events of harassment underlying his claim. Most significant, in the aftermath of the Bain Capital incident, after which Daniel alleges Melidones referred to him in a telephone call as a "fucking nigger," there is evidence that Daniel made other complaints about his employment in multiple fora. These include by setting out his "rebuttal" in a handwritten appendage to T&M's disciplinary charge, by appearing before the disciplinary committee hearing, and by emailing several T&M and Minskoff employees. Strikingly, in none of those instances did Daniel make any mention of Melidones's harassment, either explicitly or by implicit suggestion.

- On May 8, Daniel's first day back at work after the Bain incident, Daniel spoke to Greisch and complained about Melidones's May 4 tirade. Daniel does not recall stating to Greisch that Melidones had used the word "nigger" in that tirade. Nor does Greisch recall Daniel ever making such a claim. The Court finds that Daniel's complaints in that discussion instead related exclusively to Melidones's anger and what Daniel perceived as Melidones's unfair response to Daniel's workplace infractions (the receipt at work of the BB gun and other packages) that had been uncovered.

- On May 9, 2012, Daniel responded to the Notice of Disciplinary Action issued to him by Melidones. As Melidones had directed Daniel, he drafted his "rebuttal" to Melidones's description of Daniel's infractions on the back of the form. In his handwritten rebuttal, Daniel objected to the charges against him. *See* PX 13. He

also wrote that he had "witnessed Mr. Melidones screamed [*sic*]/cursing at guards using profane[] languages. Referring to many of the staffs as buffoons, idiots, useless, and incompetents." *Id.* Notably, Daniel did not there claim that Melidones had screamed or cursed at him or referred to him as a buffoon or by any other name.[4]

---

[4] During the defense case at trial, Daniel sought leave to reopen his case to submit a document that, he claimed, was a letter that he had written and delivered to Melidones's desk on May 9 at the same time that he wrote this rebuttal. *See* PX 20. In its discretion, the Court permitted this letter to be received and for that limited purpose re-opened Daniel's direct case and permitted Daniel to be recalled to testify about the preparation and delivery of the letter. Dated May 9, 2012, the letter captures the core elements of Daniel's harassment claim as formulated in this Court: It references "months of enduring your insults," and Melidones's "calling me gay last summer," having "touched my ass," "making racial remarks about my ethnicity," "watching me change[] into my uniform in the locker room," "and yesterday you hitting me on the shoulder." Daniel testified that he drafted this letter in the evening of May 9, after having left his post and gone up to the T&M/Minskoff offices at 590 Madison. There, Daniel testified, he took a piece of paper from a copy machine and, using a pen he carried with him, quickly wrote the letter to Melidones. Daniel testified that he then used the copy machine in the T&M/Minskoff offices to make a copy of this letter as well as the two-sided disciplinary form and rebuttal. Daniel testified that he left the original of the letter and disciplinary form/rebuttal on Melidones's desk and took with him the copies.

Were Daniel's claim to have written this letter on the date that appears on it credited, PX 20 would be highly probative evidence, akin to a real-time complaint made by a victim to an outcry witness, as it would situate Daniel's claims of harassment (both in general and as to specifics) far earlier in time, and indeed prior to Daniel's termination. For a number of independent reasons, however, the Court cannot credit this testimony. To begin, having observed Daniel attempt to account for the relevant events as to PX 20 on the witness stand, including on cross-examination and in response to questions from the Court, the Court found Daniel's demeanor and shifting answers highly inconsistent with truth-telling. He strongly appeared to the Court to be making up details on the fly. Further, Daniel had never previously testified about this writing or the portion of the events of May 9 relating to it, either in his deposition or earlier in the trial, when Daniel had testified that he had faxed a copy of the rebuttal to Wood at T&M. On the contrary, in response to questions from the Court about the timeline of the night of May 9, Daniel never mentioned this letter or his alleged visit to the T&M/Minskoff offices. Daniel did not offer any persuasive explanation for why the events surrounding the letter had been missing from his earlier accounts. The letter also surfaced conveniently. Daniel filed it on the docket of this case on October 7, 2013, four months after filing suit and six months after the DHR had made a finding of no probable cause to support Daniel's claims. *See* Dkt. 31. In contrast, the Court found highly credible Melidones's firm denial in testimony of having seen PX 20 before. The

- In the early morning hours of May 10, 2012, Daniel sent an email to Wood at T&M, in which he noted that he had just faxed the disciplinary report to Wood. *See* PX 11. That email recounted Daniel's view that Melidones had disciplined him "as a form of retaliation." *Id.* Daniel requested to meet with Wood to discuss Melidones's "recent hostile verbal harassment and intimidations towards me." *Id.* The email did not detail that harassment or intimidation, but the statement in the email is most naturally understood in light of the disciplinary rebuttal that it attached, which addressed Melidones's conduct relating to the disciplinary issues only.

- Later that day, Daniel emailed J. Henkin at T&M regarding his request for a sick day on May 7. Daniel explained that he had asked Melidones for a sick day but that Melidones had not responded because of "his personal vendetta against me." Daniel did not elaborate or make any claims of statements or conduct relating to race, sexual orientation, or national origin.

- On May 15, 2012, T&M's disciplinary committee—Gutstein, Scarito, Aleles, and Capponi—along with John Melidones, held a disciplinary hearing. At that hearing, Daniel attempted to explain his receipt of packages. The Court, based on the credible testimony of Aleles and Scarito, finds that Daniel was given an opportunity to air his grievances more broadly, but that Daniel did not recount any

---

Court is constrained to conclude that Daniel likely created PX 20 shortly before October 7, 2013, and backdated the letter to May 9, 2012, to supply evidence that he had complained of harassment close to the events at issue. This finding is reinforced by the Court's finding that a physically similar document dated May 16, 2012 (PX 21) that also first surfaced on October 7, 2013, and which the Court also permitted Daniel to offer on his re-opened case, was similarly created after the fact. *See infra*, at 24 n.5.

of the acts of harassment by Melidones of which he complains. Daniel chose instead to play for the committee the recording he made of the May 9 confrontation, a recording that captures rage and imperiousness on Melidones's part, but is devoid of slurs or other words of any discriminatory nature. Daniel claimed at trial that Scarito told him that at the hearing he was not allowed to speak about anything other than the packages, and that, when he attempted to do so, he was shut down by Scarito, Gutstein, and Capponi. Scarito and Aleles testified that that was untrue and that Daniel was not precluded from airing other grievances before the committee. Although the Court did not credit as accurate every single aspect of Scarito's testimony—she notably denied that Daniel's audiotape was played for the disciplinary committee, whereas all other evidence was to the contrary—the Court credits their testimony on this particular point because of its consistency and persuasiveness and based on the witnesses' demeanor.[5]

- In the early morning of May 18, 2012, Daniel emailed Gutstein, Scarito, Aleles, and Capponi to transmit further evidence in support of his contention that Melidones had authorized him to receive packages at 590 Madison. *See* PX 13. That email did not make any allegations of harassment.

---

[5] Daniel also testified that, on May 16, 2012, when he returned to the T&M offices to deliver a copy of the May 9 recording, he also delivered a handwritten letter to Scarito. *See* PX 21. The letter, dated May 16, 2012, states that Scarito and others at the May 15 meeting had "basically shut me down when I tried to bring up John's harassment towards myself and other staff." This letter, too, first surfaced on October 7, 2013, when Daniel filed it on the docket of this case. For reasons similar to those regarding PX 20, *see supra*, at 22 n.4, the Court declines to credit this testimony, and similarly concludes that the letter was likely created and backdated shortly before October 7, 2013. Notably, both Scarito and Alleles, whom Daniel testified both saw the letter in real time, firmly denied having seen it before. The Court credits their testimony on this point.

- Later that day, soon after being informed that he had been terminated, Daniel emailed Gutstein, Scarito, Aleles, and Capponi again. He wrote, "You decided to terminate me based on the inappropriate actions of Security Dir. John Melidones." *Id.* Those actions, Daniel, explained, included "[h]im lying about when I had the BB delivered and the manner it was displayed." Daniel objected to Melidones "maliciously" disciplining Daniel two months after the incident. Daniel did not mention any instances of harassment.

- On May 18, 2012, shortly after being terminated from T&M, Daniel emailed T&M's CEO, Robert Tucker. *Id.* In that email, Daniel explained that he had "had a problem with my worksite security director John [Melidones] at 590 Madison Ave." *Id.* Daniel explained further that he had appeared at the disciplinary hearing with proof that "should have exonerate[d] Mr. Melidones['s] claims." The email, however did not describe any claims Daniel might have had against Melidones. On the contrary, it stated that during the one year and five months he had worked for T&M, "I've never had a problem." *Id.*

- On the afternoon of May 18, Daniel emailed Greisch, 590 Madison's building manager, again explaining his basis for objecting to being terminated. He again did not make any claim of harassment. *Id.*

- On May 20, 2018, Daniel emailed Robert DeBenedetto at T&M to request a letter explaining his termination. Daniel explained that he intended to sue Amazon.com (where he had found the BB gun for sale), Zephyr Sports (the merchant from whom he had purchased it), and Melidones. And he represented that he had "already consulted with my local councilman, precinct, district attorney's office,

city hall, numerous attorneys and law enforcement personnel at 1 Police Plaza" to ensure "that what happened with me never happens to anyone else." That is, he intended to prevent "innocent citizens who are not aware of one's city or state laws" from possessing "what turns out to be illegal to possess." *Id.* Daniel's email again made no mention of harassment or of having complained (whether within T&M or to any of the officials he listed) of harassment.

- On May 23, 2018, Daniel sent a lengthy email to Minskoff executives. In that email, Daniel recounted the events leading up to his termination. He explained that Melidones had "berated" him following the Bain incident. *Id.* And he explained his need to take the day off on Monday, May 7, 2012. Daniel also recounted Melidones's "humiliating" disciplining of Daniel. *Id.* He explained, "Melidones could have handle[d] this matter differently than he did, but he choose [*sic*] this dramatic method to humiliate, embarrass and cause[] me to either quit or be terminated." *Id.* Further, Daniel told the Minskoff executives that Melidones had "a history of berating and insulting many guards at . . . 590 Madison by calling them buffoons, useless, idiots, incompetent and derogatory terms." *Id.* Daniel did not further elaborate, and despite his having recounted these insulting terms, did not allege that any explicitly discriminatory terms had been used.[6]

---

[6] Daniel also did not avail himself of other internal opportunities to speak out about Melidones's alleged use of this racial slur on the May 4 call. Most notably, T&M had a confidential hotline, of which Daniel acknowledged having been aware. Indeed, he testified at trial that he had left a message on the hotline in August 2011, intending to raise other issues about Melidones, to which he did not receive a response. But Daniel undisputedly did not call the hotline any other time, including after the allegedly racially explicit May 4 call.

These assembled communications overwhelmingly reflect that Daniel was indeed angry at, and complaining persistently about, Melidones in May 2012. But, critically, they also reflect that Daniel's expressed grievances against Melidones then involved two intertwined subjects: the prospect of disciplinary action leading potentially to Daniel's termination; and Melidones's harsh, humiliating—and as Daniel perceived it, unfair—treatment of him in connection with the Bain Capital incident and the review of Daniel's workplace violations (*i.e.*, the receipt of the BB gun and other packages at work). Notably, they do not reflect any expressed complaints about race, sexual orientation, or national origin discrimination. Nor do they reflect the shocking claimed incidents of bias by Melidones that Daniel testified about at trial, including the three most serious ones flagged above.

To be sure, the absence of a reference to these incidents in any one of Daniel's real-time communications could easily be explained by the fact that Daniel's clear focus after May 7 was on saving—or reclaiming—his job. And some of these communications occurred in contexts that were less natural fora than others to report a long-running pattern of harassment: Daniel's

---

As to Daniel's claim to have left a message on the hotline in August 2011, the Court finds the evidence equivocal. Daniel testified that he had left such a message; the T&M executive responsible for monitoring the hotline, Aleles, testified that he never retrieved any such message from Daniel. Each witness's testimony on this point is problematic. Daniel's overall testimony was sufficiently populated by improbable or contradicted assertions that a thoughtful factfinder cannot simply assume an unsubstantiated claim to this effect to be true. And although Aleles projected as attempting to testify accurately, a key aspect of his account beggared belief. Aleles testified that since the hotline's introduction in July 2011, he has checked the hotline voicemail account virtually daily but has never retrieved a single call by an employee to the hotline during those seven years. It is improbable, given T&M's size (at its largest, 1,760 employees), that no employee during this long period ever attempted to use the hotline or left a message on it. More likely, in the Court's assessment, is that occasional messages were received but either were ignored in real time or are forgotten today. Because Daniel bears the burden of proof, the Court cannot find that Daniel left such a message in August 2011. The Court's verdict, however, would be the same even if it had found the opposite.

email to Henkin, for example, mentioned Melidones only glancingly, and was aimed at making the simple request for a sick day.[7] However, others of these communications are such that the absence of a reference to a pattern of discriminatory abuse in general—or to Melidones's having uttered a profane and bigoted slur days earlier, or engaged in other serious conduct redolent of bias—is striking. And Daniel then had strong reasons to notify T&M of such conduct, and particularly so after his termination, as losing his job was no longer a risk. Further, taking as a whole the assembled communications in May 2012 between Daniel and T&M officials, what emerges is a picture of a man who, to his credit, had no difficulty sticking up for himself when he felt wronged. In this context, the absence of any reference to these most serious incidents strongly suggests that these did not occur, and that Daniel did not perceive himself at that time to have been a victim of discriminatory harassment.

The Court next reviews Daniel's writings in the ensuing period, beginning with his initial filing of a claim with the DHR. In this period, too, although Daniel made generalized claims of harassment and discrimination, his complaints still did not refer to the most serious incidents that Daniel claims today. And, as in May 2012, Daniel's predominant claims, as expressed, continued to involve his termination from T&M.

- In September 2012, four months after his firing, Daniel filed a complaint with the New York State Division of Human Rights. *See* DX 19. Asked to identify the ways in which he was discriminated against, Daniel checked the boxes for National Origin, Race/Color or Ethnicity, and Sexual Orientation. Next to each box, he explained the forms of discrimination he experienced. As to national

---

[7] Several other emails between Daniel and T&M officials similarly do not refer to Melidones. *See, e.g.*, PX 11 pp. 13–18.

origin, Daniel wrote: "Mr. Melidones always spoke to me with an imitated English accent." As to racial discrimination, Daniel wrote: "I was told I'm not Black. Other employees complained about racial remarks made by Mr. Melidones." And as to sexual-orientation discrimination, Daniel wrote, "[My] supervisor asked me if I'm gay and most recently on 5/3/12 said to me to be a man, I need to man up." Daniel also indicated that he had been discriminated against in retaliation for filing a complaint. He stated that when he told his supervisor of his "intention to go to the company, he vindictively served me a disciplinary write up." In a section of the form labeled "Description of Discrimination," Daniel elaborated on his claim of discrimination. He wrote that: Melidones had said to him that most property managers prefer white security guards; Melidones had asked him if he was gay and had told him that his (Melidones's) son is gay; Melidones ignored Daniel's complaint that other guards ignored and undermined him because they believed he was gay; and Melidones slapped him hard on the back and said, "Be a man, man up."

- On October 14, 2012, Daniel emailed Barby Woodard. Daniel told Woodard that he "was being verbally and physically harassed by [his] former supervisor there at 590 Madison partly because of my ethnicity and suspected sexual orientation." PX 11. Daniel asked Woodard to photograph the lobby of 590 Madison to assist him in bringing claims against Melidones and T&M, which Woodard refused to do.

- On December 16, 2012, Daniel emailed the T&M internal affairs complaint hotline. *See* DX 18. The email describes at length Daniel's account of the

circumstances surrounding his termination, including Daniel's receipt of the BB gun at work. Daniel also recounted incidents of alleged harassment, including that Melidones had slapped Daniel on the shoulder and told him to "man up," that Melidones had asked Daniel if he was gay, that Melidones had observed Daniel in the 590 Madison locker room, and that Melidones had spoken to him using an English accent. Daniel also complained that he had "witnessed Mr. Melidones calling and referring to many of the staffs myself included as idiots, assholes, buffoons, stupid and incompetent." This email did not mention Melidones's use of the words "nigger" or "gorilla" or any inappropriate touching of Daniel.

- Later that day, Daniel sent another email, containing substantially the same text, to a large number of T&M executives as well as the executives of several other security companies. *See* DX 17.

- On December 18, 2012, Daniel sent another email, containing substantially the same text, to several Minskoff executives. *See* DX 16.

The Court finds these later writings by Daniel revealing. Although these writings added detail to his theretofore general claims of discriminatory harassment, Daniel, in articulating his grievances, nowhere referenced the most explosive allegations he later came to make against Melidones.

The omission of these allegations from the complaint Daniel filed with the DHR is particularly consequential. Daniel there had every incentive and opportunity to explain his basis for claiming harassment on the basis of race, sexual orientation, and national origin, and indeed took the time to flesh out his claim. Daniel testified that he did not appreciate the significance of this form and that he lacked the opportunity to fill it out in more detail. For various reasons, the

Court does not find that excuse credible or persuasive as a reason for Daniel to have omitted his most sensational allegations, were they true. Among other things, the DHR form itself states that the complainant is free to add information on a separate page, and Daniel's allegations on the form did not even fill the space allotted. Further, even if Daniel had believed he was under time or space constraints in completing the form—and the Court does not so find—Daniel's omission of his current most significant allegations is itself notable. Such searing statements and actions would have been readily remembered and recounted.

**D.      Findings**

For the reasons that follow, the Court credits Daniel's claims as to certain workplace conduct by Melidones, but, critically, does not find established the claims as to the most serious acts of misconduct. The Court begins by identifying allegations that it has not found established.

*Racial epithet on May 4, 2012*: Most significant, the Court does not find that Melidones's telephonic tirade directed at Daniel on May 4, 2012, although likely enraged and profane, included the word "nigger" (or any other discriminatory slur). There is no corroboration of this inflammatory claim; Daniel did not make any such allegation until many months after the fact; and he did not include this claim in any of his many written complaints, including within T&M and to the DHR. Nor did Daniel otherwise memorialize this event in or anywhere close to real time or recount it to any colleague, friend, or medical or mental health professional. Instead, the claim first arose in this lawsuit, filed in June 2013, after Daniel's claims of harassment had been rejected by the DHR as lacking probable cause. These circumstances unavoidably raise questions about the veracity of Daniel's present claim to have been called a "fucking nigger" on May 4, 2012.

The Court was open to crediting uncorroborated testimony along these lines. However, the Court, on its considered review, had sufficient questions about Daniel's overall testimony to preclude it from doing so. Daniel's account of his life and challenging personal circumstances was highly sympathetic. There is much to admire about Daniel's resilience and perseverance in the daunting challenges that life has dealt him, as ably developed at trial. He also impressed the Court as a man of considerable dignity. And Daniel's testimony was sure and credible as to certain themes and particulars. However, the Court is constrained, regretfully, to find that Daniel's testimony also had numerous moments of inconsistencies, glibness, excuse-making, and inattention to detail. At times, too, Daniel's testimony betrayed a degree of paranoia and an easy willingness to blame T&M and/or Melidones for dimensions of his life's journey and present circumstances for which it is not credible to assign them blame. The Court therefore does not and cannot find that Daniel has carried his burden of proof as to this critical factual allegation.

Independently, as to this point, the Court found credible Melidones's denial of using this racial slur. That Melidones did not use that slur is also consistent with the uniform testimony of the other witnesses from T&M, including several other lobby guards and fire safety personnel (none of whom currently work for T&M and thus have little incentive to cover for the company). These persons—several of whom self-described as African-American or Caribbean—credibly attested that they had never heard Melidones use such words or, in any way, exhibit racial bigotry.

*Other racially explicit statements*: For much the same reasons, the Court finds that Daniel has not carried his burden to show that Melidones, earlier in Daniel's employment, called him a "gorilla." Likewise, the Court finds that Daniel has not carried his burden to prove that Melidones made the other alleged charged and racially overt comments in the workplace. These

include comments to the effect that Barby Woodard, the café manager at 590 Madison, was dating a Black man and "likes her meat dark and big"; or that Melidones repeatedly told Daniel that, given his dress, comportment, and verbal inflections, he was "not Black." Had they been established, such statements would have been clear instances of racism. They would have lent support to the claim of a racially hostile, noxious workplace environment. On the trial record, however, although the Court cannot rule out that these incidents occurred, the Court cannot affirmatively so find.[8]

*Sexual contact with Daniel*: The Court also finds that Daniel has not substantiated his claim that Melidones rubbed against Daniel's backside with his penis while Daniel was at his post, while asking Daniel, "Are you gay?" There is no witness (or follow-on outcry witness) to this episode or anything close to it; and this allegation is idiosyncratic, as the balance of Daniel's charges against Melidones involve verbal, not physical, abuse. This allegation too, is tellingly absent from Daniel's various writings and complaints in the days surrounding and the weeks and months that followed his termination. The absence of this claim from Daniel's DHR complaint

---

[8] The Court notes that one of these allegations—that Melidones told Daniel that he was "not Black"—did appear in Daniel's September 2012 DHR complaint. Among Daniel's claims of explicit racial utterances by Melidones, the Court found this one the most credible. That is both because of Daniel's pre-lawsuit claim to the same effect and because, as noted below, the Court does find that Melidones did take note of—by imitating—Daniel's erudite manner of speech. Although Melidones's imitation of Daniel's manner of speech had no explicit racial dimension and the Court cannot find that it was demonstrably racially motivated, the Court recognizes that, in theory, such imitation could have been intended to contrast Daniel's verbal erudition with a crude racial stereotype. At the same time, as to the claim that Melidones termed Daniel "not Black," there is no corroboration for Daniel's claim that Melidones repeatedly said this in the 590 Madison lobby (the other lobby personnel who testified, and who identified as African-American or Caribbean, uniformly denied hearing such comments). And Daniel did not make this claim in any of his May 2012 writings. Therefore, although the claim that Melidones called Daniel "not Black" presents a closer question, on balance, given the burden of proof and given the hesitations noted above with respect to whether Daniel's trial testimony was consistently accurate, the Court does not find this statement established.

is particularly striking. Had any such incident occurred, Daniel likely would have cited it—if not led with it—in recounting his claim of harassment on the basis of sexual orientation. The Court also credited Melidones's emphatic denial of this claim.

*"Mary Poppins"*: The Court also does not credit Daniel's allegation that Melidones told him that he would make a good Mary Poppins. Although this quip is in keeping with Melidones's mockery of Daniel's accent, the Court found credible Melidones's testimony on this point—both that he did not make any such statement to Daniel and that he had not seen and was unaware of the Broadway production *Mary Poppins* to which Daniel inferred Melidones was then referring. The Court also did not find it credible that, as Daniel alleged, Melidones, out of the blue, would have telephoned Daniel for the sole purpose of making this quip.

*"Man up"*: The Court does not credit Daniel's allegation that Melidones told him at times to "man up." There was no other evidence—from Melidones or the other T&M personnel—that Melidones used this phrase. Even if the Court had so found, it would not have found that this common locution—which connotes the need for a person (generally a man) to discharge his duties—to be denigrating, either in general, or in the contexts in which it was allegedly used at 590 Madison in relation to Daniel.

*Stolen laptop*: The Court credits Daniel that he and Melidones had a discussion about a laptop stolen within 590 Madison Avenue in which it was noted that the surveillance footage reflected that the perpetrator was a balding African-American man. Although it is possible that Melidones made some attempt at humor in this discussion that Daniel misinterpreted, the Court does not credit that Melidones made any statement in that discussion tending to accuse Daniel of this offense or implying that he, by dint of race, was a likely perpetrator.

The Court does, however, credit the following allegations:

*"Manny the homo"*: The Court finds it more likely than not that Melidones referred to lobby employee Manny Perdomo as either "Manny the homo" or some other derivative using the phrase "homo" and that Melidones did so in the presence of Daniel. Melidones admitted to having a relationship with Perdomo that involved reciprocal teasing based on their respective last names. Perdomo, Melidones testified, would call Melidones "John Melanoma." But Melidones's testimony as to what he called Perdomo was not at all credible. Melidones claimed that his reciprocal jibe to Perdomo was to say to Perdomo: "Manny go home." The Court found this testimony implausible to the point of being ridiculous. Further, even Melidones, trying at trial to articulate the words that he claimed to have used, was unable to present that testimony without slipping. At one point, the Court heard Melidones to say, "Manny go homo." The Court therefore rejects as unworthy of belief Melidones's denial that he ever used the term "homo" in referring to Perdomo. The Court finds that it is more likely than not that the actual phrase Melidones used to make fun of Perdomo's name included the derivative "homo" and was likely, at least at times, "Manny the homo," as Daniel testified. The Court also credits Daniel's testimony that Melidones's and Perdomo's reciprocal name-calling, including the use of "Manny the homo," occurred in Daniel's earshot.[9] The Court does not find, however, that these statements were directed at Daniel or were intended to refer to Daniel's sexual orientation, which, Daniel testified, he kept unknown to his co-workers. Nor does the Court find that Melidones ever called Daniel a "homo."

---

[9] The Court acknowledges that the other security guards at 590 Madison testified that they did not hear this byplay or the other remarks and conduct that the Court credits were made. While the Court cannot conclusively explain this discrepancy, one explanation is that the guards were stationed far apart from each other and had only sporadic occasions to overhear one other.

*Mimicry of Daniel's manner of speech*: The Court finds it more likely than not that, at times, Melidones, in interacting with Daniel, mimicked Daniel's accent and distinctive manner of speech. Daniel speaks with an inflection akin to a British accent, with a Caribbean lilt, and is careful in his enunciation. Particularly probative, in reviewing the audio recording that Daniel made of the May 9, 2012 confrontation, *see* PX 4, it was clear to the Court that at least as to certain words—*e.g.*, "Otis" and "ambiguity"—Melidones pronounced those words with an accent far from his own manner of speech, and intended to mimic Daniel's. Melidones was also notably defensive about this subject during trial testimony.

*Singing of calypso music*: The Court finds it more likely than not that Melidones, at least once, sang calypso music in the lobby of 590 Madison, in Daniel's presence. Melidones denied doing so. But, revealingly, when examined, he admitted being familiar with calypso music from "the end of the movie 'Beetlejuice' where they sing calypso." As Daniel's counsel aptly pointed out in her closing argument, the song featured in that movie is precisely the song that Daniel identified as having been sung by Melidones: "a calypso that was sang maybe back in the 1930s or '40s by Harry Belafonte [that] goes 'Deo, De-e-o." Indeed, the song in "Beetlejuice" was sung by Harry Belafonte.[10]

*Big words*: The Court credits Daniel's claim that Melidones asked him to define big words. Notably, on the May 9, 2012 recording, Melidones does just that: he asked Daniel whether Daniel knew what "ambiguity" means. The Court credits Daniel's claim that such statements recurred throughout his tenure at 590 Madison. It is not entirely clear to the Court, however, whether such statements were intended to mock Daniel—as Daniel appeared to view

---

[10] *See* https://pitchfork.com/thepitch/how-a-calypso-anthem-became-the-surreal-centerpiece-of-beetlejuice/ (interviewing Harry Belafonte about David Geffen's request to use Belafonte's recording of "Day-O (The Banana Boat Song)" in *Beetlejuice*).

them at trial—or as a means of commenting, without judgment, on Daniel's erudition and facility with words.

*2012 presidential election*:  The Court found credible Daniel's testimony that Melidones asked Daniel whether he would be voting for President Obama and that, when Daniel said he was a Republican, Melidones, also a Republican told him he was "all right."  Daniel's account of this exchange had the ring of truth.  That Melidones did not recall this brief exchange may reflect the passage of time and that, to many, such an exchange would be taken as innocuous.

*Locker room*:  Finally, as to Daniel's allegation that Melidones observed him in the locker room, the Court finds a portion of Daniel's claim true.  The Court finds it more likely than not that Melidones did, at least occasionally, cross paths with Daniel in the locker room at 590 Madison, which was used for changing clothes.  Such encounters most likely occurred during the first half of Daniel's employment, when he worked the day shift, which overlapped with Melidones's tour of duty.  The Court, however, does not find credible Daniel's claim that Melidones particularly watched Daniel in the locker room, deliberately followed him to the locker room, or encountered him in the locker room other than coincidentally.  The Court thus finds that while Daniel and Melidones crossed paths from time to time in the locker room, these encounters were uneventful, coincidental, and insignificant in the context of this case.

## V.  Conclusions of Law

On the facts as found above, the Court concludes that Daniel has not met his burden to establish a hostile work environment that was sufficiently pervasive or severe to support a claim under Title VII.

## A.    Aggregating

The Court begins with a threshold legal question: whether "a plaintiff may aggregate evidence of racial and sexual harassment to support a hostile work environment claim where neither charge could survive on its own." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 572 n.7 (2d Cir. 2000).

That question is—explicitly—an open one in this Circuit. *Id.*[11] It is, however, settled law that "different forms of harassment may exacerbate each other," *Donahue v. Asia TV USA Ltd.*, 208 F. Supp. 3d 505, 517 (S.D.N.Y. 2016) (citing *Cruz*, 202 F.3d at 570), "meaning that 'abuse against various different groups—such as both [gender] and [race]— . . . exacerbates the effect of harassment experienced [with respect to each characteristic] individually,'" *Duarte*, 265 F. Supp. 3d at 348–49 (quoting *Boggs v. Die Fliedermaus, LLP*, 286 F. Supp. 2d 291, 298 (S.D.N.Y. 2003)); *see also Cruz*, 202 F.3d at 572 ("Given the evidence of both race-based and sex-based hostility, a jury could find that [defendant's] racial harassment exacerbated the effects of his sexually threatening behavior and vice versa."). Some district courts in this Circuit have held, however, that "aggregation is inappropriate where . . . the claim sought to be buttressed is patently inadequate." *Weiss*, 2009 WL 2132444, at *8; *see Duarte*, 265 F. Supp. 3d at 349.

The Court need not decide here, however, whether, as a general matter, a plaintiff may aggregate evidence of multiple forms of harassment to support a hostile work environment claim where, viewed in isolation, each claim would fail. That is because, for the purposes of this case, that question has effectively been answered by the Second Circuit's decision remanding this case

---

[11] *See also Duarte v. St. Barnabas Hosp.*, 265 F. Supp. 3d 325, 348–49 (S.D.N.Y. 2017) ("The Second Circuit has . . . expressly reserved decision on 'whether a plaintiff may aggregate evidence of [two types of] harassment to support a hostile work environment claim where neither charge could survive on its own.'" (quoting *Cruz*, 202 F.3d at 572 n.7)); *Weiss v. Hustedt Chevrolet*, No. CIV.A.05-4230, 2009 WL 2132444, at *8 (E.D.N.Y. July 13, 2009) (same).

to this Court. The Circuit there instructed that the "evidence that Daniel was harassed on multiple fronts—because of his race, sex, and national origin—should also be considered when evaluating Daniel's work environment as a whole." *Daniel*, 689 F. App'x at 4 (citing *Cruz*, 202 F.3d at 572). The Circuit further noted that, when "[r]eviewed *in the aggregate*, the harassment Daniel allegedly experienced could be found to 'alter the conditions of [his] employment and create an abusive work environment' in violation of Title VII." *Id.* (emphasis added) (quoting *Oncale*, 523 U.S. at 78).

This Court, therefore, has considered below the various conduct to which Daniel was subjected in the aggregate, without regard for whether any subset of claims—sorted by reference to race, sexual orientation, or national origin—would suffice to support a claim for a hostile work environment. For the reasons explained below, the Court holds that, even viewing the conduct found holistically, the facts the Court has found established by a preponderance of the evidence do not support a claim for a hostile work environment as measured by governing case law.

### B.     Hostile work environment

Title VII "prohibits the creation of a hostile work environment" based on race, color, religion, sex, or national origin. *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2441 (2013). A plaintiff must prove that the complained of conduct: (1) "is objectively severe or pervasive—that is . . . creates an environment that a reasonable person would find hostile or abusive"; (2) creates an environment "that the plaintiff subjectively perceives as hostile or abusive"; and (3) "creates such an environment because of the plaintiff's [protected class]." *Patane*, 508 F.3d at 113 (quoting *Gregory v. Daly*, 243 F.3d 687, 691–92 (2d Cir. 2001) (alterations in original)).

"[A] work environment's hostility should be assessed based on the 'totality of the circumstances.'" *Id.* (quoting *Harris*, 510 U.S. at 23). Factors that may be considered include: "[1] the frequency of the discriminatory conduct; [2] its severity; [3] whether it is physically threatening or humiliating, or a mere offensive utterance; and [4] whether it unreasonably interferes with an employee's work performance." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 102 (2d Cir. 2010) (quoting *Harris*, 510 U.S. at 23) (internal quotation marks omitted).

Based on the totality of the circumstances of Daniel's employment as adduced at trial through the testimony of Daniel, Melidones, and their co-workers, and based on the Court's findings above as to which episodes are substantiated by a preponderance of the evidence, the Court concludes that Daniel's work environment at 590 Madison was not "hostile" for purposes of Title VII. That conclusion is not, by any means, to be taken as condoning Melidones's behavior. As the Court has found, Melidones subjected Daniel to several denigrating forms of behavior that related to protected characteristics of Daniel's. As to national origin, Melidones mimicked Daniel's distinctive speech pattern, which included a Caribbean lilt, sang a calypso tune in Daniel's presence evocative of Daniel's region of origin, and questioned Daniel about the definition of words in a way that could be read to mock Daniel's erudite manner of locution. As to sexual orientation, although there is no direct evidence that Melidones was aware that Daniel is gay, it is possible that Melidones assumed that Daniel was gay; regardless, Melidones's joking references in Daniel's presence to a co-worker as "Manny the homo" were surely experienced by Daniel as hurtful. As to race, while the Court has not found by a preponderance that Melidones made any of the racially explicit remarks alleged, Daniel reasonably could have taken Melidones's inquiry about whether Daniel would vote to reelect President Obama as a coded reference to Daniel's race. Finally, although the Court finds this behavior to have been

unconnected to any protected characteristic of his, Daniel reasonably could—and did—take

umbrage at aspects of Melidones's treatment of him during the final days of his employment. As

the surreptitious audiotape that Daniel made revealed, Melidones was in turns brusque, haughty,

contemptuous, and enraged out of any justifiable proportion at his colleague, Daniel.

Notwithstanding his workplace lapses, Daniel, as a dignified and capable professional, deserved

better.

Title VII, however, requires more.

First, the Court considers the frequency of the discriminatory conduct. Daniel contends

that even if the most severe incidents of harassment are not credited—as the Court has found—

the remaining conduct occurred sufficiently frequently to constitute a "pervasive" hostile work

environment. The Court disagrees. Critically, the evidence established that after Daniel's shift

change in September 2011, Daniel and Melidones rarely saw each other at work. As Melidones

testified, and as was corroborated by Roy Johnson, Melidones and Johnson drove together to and

from Staten Island and the office every day. Only very rarely did Melidones stay late at work

after his shift ended at 3 p.m. such that he overlapped on site with Daniel.

Even during the period before September 2011, when the bulk of the established

incidents appear to have occurred, the evidence does not establish that Melidones's harassing

acts were frequent. Rather, some of the incidents that the Court has found were isolated, singular

events. These include, the Court finds, Melidones's comment about voting for President Obama

and Melidones's singing of calypso music in Daniel's presence. As to the other conduct that the

Court has found, such conduct, the Court finds, occurred more than once: to wit, the mimicking

of Daniel's accent, the references in his presence to "Manny the homo," and the questioning of

Daniel as to the meaning of big words. However, while these acts occurred from time to time,

the Court does not find that any were persistent. While the incidence of these acts is perforce lost to history, the Court's best assessment is that, during the first months of Daniel's employment at T&M, *i.e.*, through September 2011, these incidents occurred sporadically and occasionally, not frequently. And, the Court finds, after September 2011, given the relative paucity of contact between Daniel and Melidones, such conduct was yet more limited.

Measured against reported cases, this pattern of behavior is insufficiently frequent to support a claim for a hostile work environment. There is no solid evidentiary basis from which the Court can conclude that Melidones made the remarks found any more than sporadically. *See, e.g.*, *Petrosino v. Bell Atlantic*, 385 F.3d 210, 223 (2d Cir. 2004) ("[I]solated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment."); *Alfano v. Costello*, 294 F.3d 365, 380 (2d Cir. 2002) (finding the alleged conduct non-actionable when they were "too few, too separate in time, and too mild . . . to create an abusive working environment"); *Augustin v. Yale Club of N.Y.C.*, No. 03-CV-1924 (KMK), 2006 WL 2690289, at *22 (S.D.N.Y. Sept. 15, 2006) (holding "infrequent and sporadic" remarks "over the course of five years, insufficient, as a matter of law, for Plaintiff to maintain a hostile work environment claim"), *aff'd*, 274 F. App'x 76 (2d Cir. 2008); *Trinidad v. N.Y.C. Dep't of Corr.*, 423 F. Supp. 2d 151, 167–68 (S.D.N.Y. 2006) (finding isolated incidents of defendant calling plaintiff a bitch and making sexual remarks over the course of her five and one-half years of employment insufficient to support a claim of discriminatory harassment); *Pagan v. N.Y. State Div. of Parole*, No. 98 Civ. 5840, 2003 WL 22723013, at *6 (S.D.N.Y. Nov. 18, 2003) (finding four instances of racially derogatory remarks by supervisor in the span of several months did not amount to a hostile work environment).

Second, the Court considers the severity of Melidones's harassing conduct. Significant as to this point, the Court has not found any of the most serious acts alleged by Daniel, including that Melidones used a racial slur in his May 4, 2012 tirade or racially explicit language at any point, and that Melidones rubbed his penis against Daniel's backside. Once these episodes are removed from the equation, there is no factual basis from which to find that any harassment of Daniel was severe. The remaining episodes, although by no means trifling, do not rise to the level of severity necessary to support a hostile work environment claim. *See, e.g., Augustin v. The Yale Club of N.Y.C.*, 274 F. App'x 76, 77 (2d Cir. 2008) ("[E]pisodes of name-calling, inappropriate behavior by a supervisor, and other perceived slights . . . do not constitute a hostile work environment."); *see also Fletcher v. ABM Bldg. Value*, No. 14 CIV. 4712 (NRB), 2018 WL 1801310, at *23 (S.D.N.Y. Mar. 28, 2018) (collecting cases).

Third, the Court considers whether Melidones's behavior was humiliating or threatening. As to the former, the Court finds that several areas of conduct which the Court has found to have occurred could have reasonably been experienced, and were by Daniel, as humiliating, to some degree. Melidones's repeated use of the phrase "Manny the homo," while not directed at Daniel personally, surely could have been taken to mock homosexuals. Melidones's mimicry of Daniel's accent could reasonably have been viewed as denigrating Daniel's native land. Melidones's attempts to have Daniel define large words could reasonably have been understood as an attempt to make fun of Daniel for his verbal erudition, perhaps in contrast to Melidones's different expectations for a person of Daniel's nationality and/or race. Finally, Melidones's singing of calypso music could have been taken to make fun of Daniel's Caribbean heritage insofar as it reduced the culture of Daniel's country of origin to a musical trope from a movie.

The Court finds, however that the conduct established was not, at all, threatening. Of the conduct alleged, several acts, if found, would have been justifiably perceived as threatening: being watched while changing or napping could be threatening, as could being touched sexually without consent. *See Daniel*, 689 F. App'x at 4 (noting that the "sexual harassment Daniel faced could be perceived as threatening"). But, as reviewed above, the Court has not found that either of these incidents occurred. In contrast, the conduct that the Court has found, such as Melidones's mimicry of Daniel's accent, does not qualify as threatening.

Finally, the Court considers whether the acts found interfered with Daniel's work performance. *See Harris*, 510 U.S. at 23. The Court holds against Daniel on this point. There is no evidence that Melidones's harassment interfered with Daniel's work performance up and until the May 4, 2012 incident. On the contrary, Daniel, by all accounts, was until that day a well-regarded performer to whom Melidones, in fact, had assigned certain supervisory duties.[12] There is, in contrast, considerable evidence that Daniel's performance was impacted by the events of May 4. In particular, Daniel called out sick on Monday, May 7, and, although he returned to work the following day, Daniel was demonstrably apprehensive at the workplace thereafter. However, the Court finds, the events of May 4 and thereafter that gave rise to Daniel's changed affect did not trace to the established conduct that Daniel has claimed were part of a campaign of harassment. The only conduct that the Court finds occurred on May 4 or thereafter within the scope of Daniel's claims was Melidones's brief mimicking of Daniel's accent during the May 9 audio-recorded encounter at the loading dock. That act of mimicry, the Court finds, played no

---

[12] Daniel testified that other guards ignored Daniel's supervisory directives and that he felt "undermined . . . by the staff." The record did not supply any independent evidence of this and the Court does not credit Daniel's generalized claim on this point. In any event, even crediting *arguendo* this general claim, Daniel does not allege that the other guards ignored him because of Melidones's harassing conduct.

part in inspiring fear on Daniel's part. Daniel's fear instead clearly traced to the grave job peril he suddenly found himself in beginning May 4. His supervisor Melidones had, on May 4, called out Daniel for mishandling the Bain Capital assignment, and on May 7, having been alerted to Daniel's receipt of packages including a gun at the workplace, had commenced an investigation into—and was soon well along the road to finding established—these infractions. These events, and the obvious potential they had to lead to Daniel's termination, reassignment, or other sanction, were, the Court finds, the source of Daniel's fear from May 4. The Court therefore concludes that Melidones's harassment of Daniel, to the extent found, did not materially interfere with Daniel's performance.

In sum, considering all of the *Harris* factors, and treating in the aggregate all established incidents of harassment whether on the basis of race, sexual orientation, and national origin, the Court finds that the harassment Daniel suffered does not rise to the level necessary to support a claim for a hostile work environment under Title VII. *See, e.g., Mendez-Nouel v. Gucci Am., Inc.*, 542 F. App'x 12, 13 (2d Cir. 2013) (two incidents of touching, plus sexual banter, did not rise to level of hostile work environment); *Liburd v. Bronx Lebanon Hosp. Ctr.*, 372 F. App'x 137, 139–40 (2d Cir. 2010) (several comments, including "black ass," in combination with additional "crude and contemptible" behavior, did not rise to level of hostile work environment); *Alfano*, 294 F.3d at 376 (five sex-related incidents over four years, including repeated sexual innuendo, combined with harassment not related to sex, insufficient to support a jury verdict for hostile work environment). Most critically, for the reasons above, the incidents of harassment that the Court credits occurred were insufficiently severe or frequent to have materially affected Daniel's employment.

**CONCLUSION**

For the foregoing reasons, the Court hereby awards judgment to T&M. The Clerk of Court is respectfully directed to close this case.[13]

SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge

Dated: July 12, 2018
New York, New York

---

[13] The Court wishes to compliment counsel for both parties for their professionalism and dedication. The quality of pretrial submissions and trial advocacy was quite high and greatly assisted the Court. The Court particularly wishes to thank plaintiff's counsel, the law firm of Debevoise & Plimpton, for taking on, pro bono, the representation of Mr. Daniel.